**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ANGEL MENDEZ; JENNIFER LYNN
GARCIA,
Plaintiffs-Appellees/
Cross-Appellants,

v.

COUNTY OF LOS ANGELES; COUNTY
OF LOS ANGELES SHERIFFS
DEPARTMENT,
Defendants,

and

CHRISTOPHER CONLEY, Deputy;
JENNIFER PEDERSON,
Defendants-Appellants/
Cross-Appellees.

Nos.  13-56686
13-57072

D.C. No.
2:11-cv-04771-
MWF-PJW

OPINION

Appeal from the United States District Court
for the Central District of California
Michael W. Fitzgerald, District Judge, Presiding

Argued and Submitted
December 8, 2015—Pasadena, California

Filed March 2, 2016

Before: Ronald M. Gould and Marsha S. Berzon,
Circuit Judges, and George Caram Steeh III,[*]
Senior District Judge.

Opinion by Judge Gould

## SUMMARY[**]

### Civil Rights

The panel (1) affirmed the district court's bench trial judgment finding that Los Angeles County Sheriff's Department deputies were not entitled to qualified immunity for a warrantless entry and were liable for the damages arising from the shooting that followed, (2) dismissed as moot plaintiffs' cross-appeal, (3) reversed the district court's determination that the deputies were not entitled qualified immunity on plaintiffs' knock-and-announce claim, and (4) remanded for the district court to vacate the nominal damages for that claim.

While participating in a warrantless raid of a house, the defendant deputies entered the backyard, opened the door to a wooden shack, and shot plaintiffs, a homeless couple who resided in the shack.

[*] The Honorable George Caram Steeh III, Senior District Judge for the U.S. District Court for the Eastern District of Michigan, sitting by designation.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel first held that the district court properly determined that the deputies conducted a search within the meaning of the Fourth Amendment under clearly established law. The panel determined that the facts supported a finding that the shack was in the curtilage adjacent to the home and that it was clearly established at the time that the deputies undertook a search by entering the rear of the house through a gate and by further opening the door to the shack in the curtilage behind the house. The panel agreed with the district court that the deputies did not demonstrate specific and articulable objective facts of an exigency that would meaningfully differentiate this case from clearly established law, or that would have demonstrated that the entry was a lawful protective sweep. Because the officers violated the Fourth Amendment by searching the shack without a warrant, which proximately caused the plaintiffs' injuries, the panel held that the district court's award of damages under the provocation doctrine was proper.

The panel held that the deputies violated the knock-and-announce rule, but that the law in 2010 was not clearly established in this respect. To clearly establish the law going forward, the panel held that officers must knock and re-announce their presence when they know or should reasonably know that an area within the curtilage of a home is a separate residence from the main house. Finally, the panel held that even though only one of the officers opened the door to the shack, both were liable as integral participants in the unlawful search.

**COUNSEL**

Thomas C. Hurrell, Melinda Cantrall (argued), Hurrell Cantrall LLP, Los Angeles, California, for Defendants-Appellants/Cross-Appellees.

David Drexler, Sherman Oaks, California, for Plaintiffs-Appellees/Cross-Appellants.

**OPINION**

GOULD, Circuit Judge:

While participating in a warrantless raid of a house, Los Angeles County Sheriff's Department deputies Christopher Conley and Jennifer Pederson entered the backyard, opened the door to a wooden shack, and shot Angel and Jennifer Mendez, a homeless couple who resided in the shack. After a bench trial, the district court held that the deputies violated the Fourth Amendment knock-and-announce requirement and prohibition on warrantless searches, finding that no exigent circumstances applied. The district court denied the deputies' bid for qualified immunity and awarded the Mendezes damages.

The deputies argue on appeal that the district court erred by denying their qualified immunity defense. The Mendezes cross-appeal the district court's conclusion that the deputies had probable cause to believe that a wanted parolee was hiding in the shack when the deputies searched it. We affirm the district court's conclusion that the deputies were not entitled to qualified immunity for their warrantless entry, and we hold that the district court properly awarded damages for

the shooting that followed.  Given this disposition, the cross-appeal is dismissed as moot.  We reverse, however, the district court's determination that the deputies were not entitled qualified immunity on the knock-and-announce claim, and we remand for the district court to vacate the nominal damages for that claim.

# I

Because this case involves the deputies' renewed assertion of qualified immunity after judgment, we recite the following facts in the light most favorable to the nonmoving parties and the factfinder's verdict.  *A.D. v. Cal. Highway Patrol*, 712 F.3d 446, 452–53 (9th Cir. 2013).

In October 2010, Deputies Christopher Conley and Jennifer Pederson were part of a team of twelve police officers that responded to a call from a fellow officer who believed he had spotted a wanted parolee named Ronnie O'Dell entering a grocery store.  O'Dell had been classified as armed and dangerous by a local police team, although that classification was "standard" for all parolees-at-large without regard to individual circumstances.  Before that day, "Conley and Pederson did not have any information regarding Mr. O'Dell."  Conley testified that at the time of the search he knew nothing about O'Dell's "criminal past" and that he didn't recall being given information that O'Dell was armed and dangerous, and Pederson testified that the only information she was given about O'Dell was that he was a parolee-at-large.[1]  The officers searched the grocery store for

---

[1]  Pederson also stated, in response to a leading question, that she was shown a "flyer of sorts" containing a picture of O'Dell and information about O'Dell's criminal history, but she did not testify what the flyer

O'Dell but did not find him. The officers then met behind the store to debrief.

During this debriefing, another deputy, Claudia Rissling, received a tip from a confidential informant that a man fitting O'Dell's description was riding a bicycle in front of a residence owned by a woman named Paula Hughes. The officers "developed a plan" in which some officers would proceed to the Hughes house, but because "the officers believed that there was a possibility that Mr. O'Dell already had left the Hughes residence," others would proceed to a different house on the same street. Conley and Pederson were "assigned to clear the rear of the Hughes property for the officers' safety . . . and cover the back door of the Hughes residence for containment." The officers were told that "a male named Angel (Mendez) lived in the backyard of the Hughes residence with a pregnant lady (Mrs. Mendez)."[2] Pederson heard that announcement, but Conley testified that he did not recall it.[3]

Conley and Pederson arrived at the Hughes residence along with three other officers. The officers did not have a search warrant to enter Hughes's property. Conley and Pederson were directed "to proceed to the back of the Hughes residence through the south gate." Once in the backyard, the

_____

described.

[2]   Mr. Mendez was a high school friend of Hughes, and Hughes allowed him to construct and live in a shack in her backyard. The Mendezes had been living there for about ten months.

[3]   The district court found that "[e]ither he did not recall the announcement at trial or he unreasonably failed to pay attention when the announcement was made."

deputies encountered three storage sheds and opened each of them, finding nothing.

During this time, other officers (led by Sergeant Gregory Minster) banged on the security screen outside Hughes's front door and asked Hughes to open the door. Speaking through the door, Hughes asked the officers whether they had a warrant, and she refused to open the door after being told they did not. Minster then heard someone running inside the residence, who he assumed was O'Dell. The officers retrieved a pick and ram to bust open Hughes's door, at which point Hughes opened the front door. Hughes was pushed to the ground, handcuffed, and placed in the backseat of a patrol car. The officers did not find anyone in the house.

Pederson then met up with Minster and told him, "I'm going [to] go ahead and clear the backyard," and Minster approved. Conley and Pederson then proceeded through the backyard toward a 7' x 7' x 7' shack made of wood and plywood. The shack was surrounded by an air conditioning unit, electric cord, water hose, clothes locker (which may have been open), clothes, and other belongings. The deputies did not knock and announce their presence at the shack, and Conley "did not feel threatened." Approaching the shack from the side, Conley opened the wooden door and pulled back a blue blanket used as a curtain to insulate the shack. The deputies then saw the silhouette of an adult male holding what appeared to be a rifle pointed at them. Conley yelled "Gun!" and both deputies fired fifteen shots in total. Other nearby officers ran back toward the shots, and one officer shot and killed a dog.

The tragedy is that in fact, Mendez was holding only a BB gun that he kept by his bed to shoot rats that entered the

shack; as the door was opening, he was in the process of moving the BB gun so he could sit up in bed. The district court found that the BB gun was pointed at the deputies, although the witnesses' testimony on that point was conflicting and the court recognized that Mendez may not have intended the gun to point that direction while he was getting up. Both Mendezes were injured by the shooting. Mr. Mendez required amputation of his right leg below the knee, and Ms. Mendez was shot in the back.

The Mendezes sued Conley and Pederson under 42 U.S.C. § 1983, alleging a violation of their Fourth Amendment rights. After a bench trial, the district court held that the deputies' warrantless entry into the shack was a Fourth Amendment search and was not justified by exigent circumstances or another exception to the warrant requirement. The district court also held that the deputies violated the Fourth Amendment knock-and-announce rule. The court concluded that given Conley's reasonably mistaken fear upon seeing Mendez's BB gun, the deputies did not use excessive force when shooting the Mendezes, *see Graham v. Connor*, 490 U.S. 386 (1989), but the deputies were liable for the shooting under our circuit's provocation rule articulated in *Alexander v. City & County of San Francisco*, 29 F.3d 1355 (9th Cir. 1994). The court also held that its conclusions in each respect were supported by clearly established law and that the officers were not entitled to qualified immunity. The Mendezes were awarded roughly $4 million in damages for the shooting, nominal damages of $1 each for the unreasonable search and the knock-and-announce violation, and attorneys' fees. The deputies filed a notice of appeal, as well as a motion to amend the judgment arguing that the district court erred in denying qualified immunity. The district court denied the motion, and the deputies filed a

second notice of appeal as to that decision. The Mendezes filed a cross-appeal challenging aspects of the district court's factfinding in case we were inclined to grant qualified immunity on the facts as found by the district court.[4]

## II

We review de novo the district court's post-trial denial of qualified immunity, construing the facts in the light most favorable to the factfinder's verdict and the nonmoving parties. *Cal. Highway Patrol*, 712 F.3d at 452–53. The court's factual findings are reviewed for clear error. *Resilient Floor Covering Pension Trust Fund Bd. of Trs. v. Michael's Floor Covering, Inc.*, 801 F.3d 1079, 1088 (9th Cir. 2015).

Law enforcement officers are entitled to qualified immunity from damages unless they violate a constitutional right that "was clearly established at the time of the alleged misconduct." *Ford v. City of Yakima*, 706 F.3d 1188, 1192 (9th Cir. 2013) (citations omitted). This inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). But "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). "[T]he salient question . . . is whether the state of the law" at the time of the events (here, October 2010) gave the deputies "fair warning" that their conduct was unconstitutional. *Id.* In other words, an officer is entitled to qualified immunity unless existing case law "*squarely governs* the case here."

---

[4] The Mendezes state that they waive their cross-appeal if we affirm the district court's award of monetary damages for the shooting.

*Mullenix v. Luna*, 136 S. Ct. 305, 309 (2015) (per curiam) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 201 (2004)).

## III

## A

We start by analyzing the legality of the deputies' entry into the wooden shack. The deputies first argue that they did not "search" the shack within the meaning of the Fourth Amendment when Conley opened the door.

In 2010, the law was clearly established that a "search" under the Fourth Amendment occurs when the government invades an area in which a person has a "reasonable expectation of privacy." *United States v. Scott*, 450 F.3d 863, 867 (9th Cir. 2005) (citing *Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring)). This includes the "area immediately adjacent to a home," known as the "curtilage." *United States v. Struckman*, 603 F.3d 731, 739 (9th Cir. 2010) (citation omitted). Four factors used to determine whether an area lies within the curtilage are "the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by." *Id.* (quoting *United States v. Dunn*, 480 U.S. 294, 301 (1987)).

The deputies contend that not every reasonable officer would have assumed that this "dilapidated" shack was a dwelling. This assertion is irrelevant, as it erroneously assumes that the Fourth Amendment applies only to residences. *See Dunn*, 480 U.S. at 307–08 ("[T]he general

rule is that the curtilage includes all outbuildings used in connection with a residence, such as garages, sheds, and barns connected with and in close vicinity of the residence.") (citation and internal alterations omitted); *United States v. Johnson*, 256 F.3d 895, 898 (9th Cir. 2001) (en banc) (holding that a shed may be protected under the Fourth Amendment and remanding for district court to answer the question in first instance). In *Struckman*, we held that a "backyard—a small, enclosed yard adjacent to a home in a residential neighborhood—is unquestionably such a 'clearly marked' area 'to which the activity of home life extends.'" 603 F.3d at 739 (citation omitted).

In this case, the trial court found that the shack was thirty feet from the house; it "was not within the fence that enclosed the grassy backyard area" but "was located in the dirt-surface area that was part of the rear of the Hughes property" and could not be observed, let alone entered, "without passing through the south gate and entering the rear of the Hughes property." These facts support a finding that the shack was in the curtilage. Therefore, it was clearly established under *Struckman* and *Dunn* that the deputies undertook a search within the meaning of the Fourth Amendment by entering the rear of Hughes's property through a gate and by further opening the door to the shack in the curtilage behind the house. The deputies' citations to cases involving "abandoned property" are inapposite because even if the *shack* was "dilapidated," the officers knew that Hughes lived in the *house*, and the shack was very clearly in the curtilage of the house.

The district court correctly determined that the deputies conducted a search within the meaning of the Fourth Amendment under clearly established law.

**B**

The deputies next argue that they are entitled to qualified immunity because a reasonable officer could have thought that exigent circumstances justified the search.

A warrantless search "is reasonable only if it falls within a specific exception to the warrant requirement." *Riley v. California*, 134 S. Ct. 2473, 2482 (2014) (citing *Kentucky v. King*, 563 U.S. 452, 459–62 (2011)). The exigent circumstances exception encompasses situations in which police enter without a warrant "to render emergency assistance to an injured occupant or to protect an occupant from imminent injury," while "in hot pursuit of a fleeing suspect," or "to prevent the imminent destruction of evidence." *King*, 563 U.S. at 460 (citations omitted) (collecting cases).

The deputies primarily argue that "[a]n officer may enter a third party's home to effectuate an arrest warrant if he has probable cause or a reason to believe the suspect is within, and exigent circumstances support entry without a search warrant." Although the question is quite debatable, we will assume without deciding that the officers were not "plainly incompetent" in concluding they had probable cause to believe that O'Dell was in the shack behind Hughes's house. *Stanton v. Sims*, 134 S. Ct. 3, 5 (2013).[5] Even with probable

---

[5] To mention just one consideration, O'Dell was supposedly spotted riding a bicycle in front of Hughes' house. Unless he was riding in circles, he would have passed the house before the officers arrived. The original group of officers recognized this, as some of them went to another house to look for O'Dell. But we have no reason to further address the probable cause question, as we may affirm while assuming the district court's probable cause predicate.

cause, clearly established law indicates the unlawfulness of the deputies' entry into the shack in this case.

As the Supreme Court held in *Steagald v. United States*, 451 U.S. 204 (1981), exigent circumstances to enter a home do not exist merely because the police know the location of a fugitive, even if they possess an arrest warrant for that person. *Id.* at 211–12. In *Steagald*, the police received a tip from a confidential informant regarding the location of "a federal fugitive wanted on drug charges." *Id.* at 206. The officers executed an arrest warrant at that location two days later, but the Court held that the search-warrantless entry could not be justified absent exigent circumstances. *Id.* at 211–12. The Court rejected the view that "a search warrant is not required in such situations if the police have an arrest warrant and reason to believe that the person to be arrested is within the home to be searched." *Id.* at 207 n.3. *Steagald* establishes that in this case, the fact that the deputies suspected O'Dell to be in the shack was not, by itself, sufficient to justify the warrantless search.

Although the deputies do not use the phrase "hot pursuit," their exigency argument seems to be premised on that doctrine.[6] The hot pursuit exception typically encompasses situations in which police officers begin an arrest in a public place but the suspect then escapes to a private place. *United States v. Santana*, 427 U.S. 38, 42–43 (1976). In *Warden v. Hayden*, 387 U.S. 294 (1967), the Supreme Court upheld a

---

[6] Indeed, the other three possibilities listed in *King*—that officers entered to render emergency assistance to an injured occupant, to protect an occupant from imminent injury, or to prevent the imminent destruction of evidence, *King*, 563 U.S. at 460—do not fit the circumstances presented here.

warrantless entry into a home when "police were informed that an armed robbery had taken place, and that the suspect had entered [the home] less than five minutes before they reached it." *Id.* at 298. By contrast, the Court concluded in *Welsh v. Wisconsin*, 466 U.S. 740 (1984), that the state's hot pursuit argument was "unconvincing because there was no immediate or continuous pursuit of the petitioner from the scene of a crime." *Id.* at 753.

As a preliminary matter, a police officer spotting O'Dell, a wanted parole-violator, outside of a grocery store does not appear to qualify as pursuit from "the scene of a crime" as in *Warden* or *Welsh*. But even assuming the hot pursuit doctrine applies, *Welsh* explains why the deputies here are not entitled to qualified immunity. In *Welsh*, a witness "observed a car being driven erratically" and called the police, but the driver abandoned his car and "walked away from the scene." 466 U.S. at 742. Police arrived "[a] few minutes later" and, after determining that the owner of the car was Welsh, the police walked to Welsh's residence "a short distance from the scene." *Id.* at 742–43. Without securing a warrant or consent, the police entered and arrested Welsh. *Id.* at 743. The Court held that the entry was not valid under the hot pursuit doctrine because "there was no immediate or continuous pursuit of the petitioner from the scene of a crime." *Id.* at 753.

Our court, sitting en banc, applied *Welsh* to a situation in which police officers broke into a fenced yard in search of a man who escaped while police were arresting him on an outstanding warrant. *Johnson*, 256 F.3d at 898–900, 907–08. We concluded that the search in that case was not "continuous" because the officers had seen the suspect run into the woods but lost sight of him for "over a half hour"

before they entered the property at issue. *Id.* at 907–08. "[A]ny other outcome," we cautioned, "renders the concept of 'hot pursuit' meaningless and allows the police to conduct warrantless searches while investigating a suspect's whereabouts." *Id.* at 908.

*Welsh* and *Johnson* squarely govern this case and clearly establish that the hot pursuit doctrine does not justify the deputies' search of the shack. Officer Zeko spotted a person he thought was O'Dell outside the grocery store, but that was the last time any policeman saw him before the search took place, which the record suggests was about one hour later. While the deputies received additional information about O'Dell's possible location from the confidential informant, the location identified was outside Hughes' home, not in the house or the shack behind it. And the officers still did not enter the shack until at least fifteen minutes after learning that O'Dell was outside Hughes' home. Moreover, the officers were far from sure that O'Dell was still (or had ever been) inside Hughes's house—let alone in the shack—as evidenced by the fact that they simultaneously searched a house down the street. As in *Welsh*, "there was no immediate or continuous pursuit of the [suspect] from the scene of a crime." 466 U.S. at 753. And as *Johnson* established, *Welsh* applies when the police enter the backyard of a third-party to look for a suspect, even when the suspect has evaded prior attempts at arrest (as O'Dell apparently had). *Johnson*, 256 F.3d at 899–900, 907.

The deputies also try to justify the warrantless entry based on a threat to the officers' safety, urging that O'Dell had been categorized as armed and dangerous. But *Steagald* and *Johnson* both counsel that exigent circumstances do not exist just because the police are dealing with a fugitive, even if he

is wanted on serious federal drug charges. *Steagald*, 451 U.S. at 207; *Johnson*, 256 F.3d at 900, 908. Moreover, Conley testified that he was not aware of O'Dell's categorization and did not have any information about O'Dell. Conley explained that his gun was drawn during the search because he "intermittently" used the light on his gun to "see what was inside of the sheds." A search cannot be considered reasonable based on facts that "were unknown to the officer at the time of the intrusion." *Moreno v. Baca*, 431 F.3d 633, 639 (9th Cir. 2005). And even if we assume that Pederson knew about the characterization, the district court found that "the deputies lacked any credible information that the suspect, O'Dell, was in Plaintiffs' shack," which explains why Conley "did not feel threatened" before entering the shed. The deputies correctly assert that the exigent circumstances inquiry is objective, not subjective, *see Anderson v. Creighton*, 483 U.S. 635, 641 (1987), but the information they had at the time, as confirmed by the conclusions they reached on the scene, is certainly pertinent. We agree with the district court that these facts support a conclusion based on the objective "totality of the circumstances" that the deputies "failed to demonstrate 'specific and articulable facts'" of an exigency.[7]

While the deputies' brief urges that "judges should be cautious about second-guessing a police officer's assessment, made on the scene, *of the danger presented by a particular situation*," (emphasis in brief) (quoting *Ryburn v. Huff*, 132 S. Ct. 987, 991–92 (2012) (per curiam)), that argument is

---

[7] The deputies' brief also contends that there was a possibility of ambush arising from other debris in the yard, including parked cars, but even if so, a threat of ambush from other structures would not justify searching the shack.

inconsistent with the fact that the deputies here did *not* fear imminent violence. We agree with the district court that on this record the deputies did not demonstrate specific and articulable objective facts of an exigency that would meaningfully differentiate this case from clearly established law.

## C

Next, the deputies argue that they could have reasonably assumed that Hughes had consented to a search of the shack. The district court assumed for the sake of analysis that Hughes had authority to consent to a search of the shack, but it reasoned that even if Hughes had allowed the officers to enter her home after officers brought a pick and ram from their patrol car and set the pick against the door, any "consent" was "coerced and consequently invalid." The deputies argue that because they spoke to another officer (Sergeant Minster) in the Hughes residence before searching the shack, "the defendants would assume the officers were lawfully in the main residence," and they "could reasonably believe the sergeant obtained consent for the search" of the shack.

We are not persuaded by this argument. Given the deputies' position that they lawfully entered the backyard pursuant to an exigent circumstance, it is unclear why the deputies would have thought that the other officers had gained consent to search the house rather than having relied on exigent circumstances as well. And the deputies point to no facts in the record suggesting that they knew Hughes had consented to a search of the *shack*. The district court correctly determined that the deputies could not have

reasonably believed that their search of the shack was consensual.

## D

Finally, the deputies argue that their search of the shack was a lawful protective sweep.  We note that there is both a split between the circuits and a split within our circuit as to whether a protective sweep may be done "where officers possess a reasonable suspicion that their safety is at risk, even in the absence of an arrest."  *United States v. Torres-Castro*, 470 F.3d 992, 997 (10th Cir. 2006) (collecting cases, including *United States v. Reid*, 226 F.3d 1020, 1027 (9th Cir. 2000), and *United States v. Garcia*, 997 F.2d 1273, 1282 (9th Cir. 1993)).  We assume without deciding that the protective sweep doctrine could apply here.  And, although the question is subject to debate, *see* n.5, *supra*, we further assume without deciding that the deputies' entry into Hughes's house was lawful and a protective sweep could be proper if all other requirements were met.

The district court determined that the officers did not conduct a lawful protective sweep because, even assuming that entry into the Hughes residence was constitutional, the deputies' authority to conduct a protective sweep did not extend to the shack.  The court concluded that "there is clearly established law requiring a separate warrant for a separate dwelling, especially when officers are aware of the separate dwelling's existence," so lawful presence in the house did not justify sweeping the shack.

We need not decide whether the district court's qualified immunity analysis was correct, as the deputies' protective sweep argument fails for another reason.  To justify a

protective sweep, police must identify "specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warranted the officer in believing that the area swept harbored an individual posing a danger to the officer or others." *Buie*, 494 U.S. at 327 (internal citations, alterations, and quotation marks omitted). The deputies are incorrect when arguing that even if "there were no exigent circumstances to permit a search of the shed, a reasonable officer *could* have believed it was proper to search the shed as [part of a] protective sweep." As we have explained, "the protective sweep and exigent circumstances inquiries are related." *United States v. Furrow*, 229 F.3d 805, 811 (9th Cir. 2000), *overruled in part on other grounds by Johnson*, 256 F.3d at 914. For the same reasons that exigent circumstances did not justify entry into the shack, *see* section III.B., *supra*, the deputies did not have the requisite suspicion of danger to justify a protective sweep.

For the foregoing reasons, we hold that the deputies violated clearly established Fourth Amendment law when entering the wooden shack without a warrant.

## IV

The district court also concluded that the deputies violated clearly established law because they did not knock-and-announce their presence at the shack before they entered it. We hold that the deputies violated the knock-and-announce rule, but our law in 2010 was not clearly established in this respect. We reverse on this count and remand for the district court to vacate the nominal damages on this claim.

**A**

The Fourth Amendment knock-and-announce rule requires officers to announce their presence before they enter a home. *Wilson v. Arkansas*, 514 U.S. 927, 931–34 (1995). Police may be exempt from the requirement, however, when "circumstances present[] a threat of physical violence." *Richards v. Wisconsin*, 520 U.S. 385, 391 (1997) (quoting *Wilson*, 514 U.S. at 936). The district court determined here that because the shack was a separate residence, a fact that the officers knew or should have known, the officers were required to announce their presence at the shack, and that no exception applied for the same reasons that there was no exigency to enter for officer safety.

For the reasons stated above, the district court correctly concluded that no exigency exception applied. *See also United States v. Granville*, 222 F.3d 1214, 1219 (9th Cir. 2000) (holding that a no-knock entry was not justified because the government did not "cite any specific facts" suggesting that Granville posed a threat to the officers). In *Granville*, we explained, "The government simply relies on generalizations and stereotypes that apply to all drug dealers. Our cases have made clear that generalized fears about how drug dealers usually act or the weapons that they usually keep is not enough to establish exigency." *Id.* Here, the deputies similarly rely on a stereotypical characterization of all parolees-at-large as a threat without pointing to any specific facts known about O'Dell. We conclude that the knock-and-announce exigency exception does not apply.

The officers did, however, announce their presence at Hughes' front door, and we disagree with the district court that existing case law squarely governs the question whether

the deputies needed to announce their presence again before entering the shack in the curtilage.  We have stated that "officers are not required to announce at [e]very place of entry," *United States v. Valenzuela*, 596 F.2d 1361, 1365 (1979) (citation omitted) (holding that there is no requirement to knock at a garage after properly entering home), and we are not aware of case law clearly establishing that officers must re-announce their presence at a shack in the curtilage, even if it was obvious that it was being used as a residence.

Concluding otherwise, the district court relied on *United States v. Villanueva Magallon*, 43 F. App'x 16 (9th Cir. 2002), which held that the knock-and-announce rule was *not* violated during the search of a separate house (#784) on the same property because "Villanueva possessed and controlled both 792 and 784 and, in fact, 784 was not being used as a separate residence by some third, innocent party." *Id.* at 17–18.  The district court reasoned that because the shack in this case *was* being used as a separate residence by a third party, a knock was required.  But *Villanueva Magallon* also stated that officers are not required to knock and announce "at each additional point of entry into structures within the curtilage." *Id.* at 18.  Because the shack here was in the curtilage, *Villanueva Magallon* does not clearly prohibit the deputies' actions here.

The district court also relied on the proposition in *United States v. Cannon*, 264 F.3d 875, 879 (9th Cir. 2001), that entry into a separate dwelling (in *Cannon*, a rental unit in the rear of the house) requires a separate warrant.  This proposition is at too high a level of generality to constitute clearly established law on the question whether police are required to separately knock and announce their presence at a shack in the curtilage.  *Mullenix*, 136 S. Ct. at 308 ("We

have repeatedly told courts . . . not to define clearly established law at a high level of generality." (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011))).

In the absence of clearly established law that squarely governs the situation here, qualified immunity is appropriate on the knock-and-announce claim. *Id.* at 309. We reverse and remand for the district court to vacate the award of nominal damages on this claim.

**B**

To clearly establish the law going forward, *see Pearson v. Callahan*, 555 U.S. 223, 236 (2009), we hold that the deputies violated the Fourth Amendment when they failed to knock at the shack. We do not retreat from the general principle that "officers are not required to announce at [e]very place of entry" within a residence. *Valenzuela*, 596 F.2d at 1365. But we agree with the district court that the deputies here should have been aware that the shack in the backyard was being used as a separate residence. The deputies were told that a couple was living behind the house, and the shack itself was surrounded by an air conditioning unit, electric cord, water hose, and clothes locker. And parallel to the district court's reasoning that a knock should be required for a separate residence just as a warrant is, *see Cannon*, 264 F.3d at 879, we hold that officers must knock and re-announce their presence when they know or should reasonably know that an area within the curtilage of a home is a separate residence from the main house.

This rule is supported by the purposes of the knock-and-announce rule, which is designed to protect our privacy and safety within our homes. *United States v. Becker*, 23 F.3d

1537, 1540 (9th Cir. 1994). We have recognized that when officers fail to knock and announce, they risk the "violent confrontations that may occur if occupants of the home mistake law enforcement for intruders." *United States v. Combs*, 394 F.3d 739, 744 (9th Cir. 2005). Indeed, here an announcement that police were entering the shack would almost certainly have ensured that Mendez was not holding his BB gun when the officers opened the door. Had this procedure been followed, the Mendezes would not have been shot.

## V

Although the district court held that the deputies' shooting of the Mendezes was not excessive force under *Graham v. Connor*, 490 U.S. 386 (1989), the district court awarded damages under the provocation doctrine. "[W]here an officer intentionally or recklessly provokes a violent confrontation, if the provocation is an independent Fourth Amendment violation, he may be held liable for his otherwise defensive use of deadly force." *Billington v. Smith*, 292 F.3d 1177, 1189 (9th Cir. 2002) (citing *Alexander v. City & County of San Francisco*, 29 F.3d 1355 (9th Cir. 1994)). Here, the district court held that because the officers violated the Fourth Amendment by searching the shack without a warrant, which proximately caused the plaintiffs' injuries, liability was proper. We agree.

The deputies argue first that the provocation doctrine is inapplicable because they did not "provoke a *violent* response by plaintiffs." In other words, they claim that because Mr. Mendez did not intend to threaten the officers with his gun, he was not responding to the deputies' actions and they did not "provoke" him. We reject this argument. Our case law

does not indicate that liability may attach only if the plaintiff acts violently; we simply require that the deputies' unconstitutional conduct "created a situation which led to the shooting and required the officers to use force that might have otherwise been reasonable." *Espinosa v. City & County of San Francisco*, 598 F.3d 528, 539 (9th Cir. 2010). And the consequences of the deputies' position make that position unpersuasive. On their theory, Mendez would ostensibly be entitled to damages if after entry he had intentionally pointed a weapon at the police while shouting "I'll kill you," but here he would be out of luck because he was merely holding a BB gun and didn't intend to threaten the police.

Moreover, this case does not require us to extend the provocation doctrine; we have applied provocation liability in a similar circumstance without requiring the plaintiff to show he acted violently. In *Espinosa*, we found that liability under *Alexander-Billington* was possible when officers entered an attic and shot a man because an officer "believed that he saw something black in [the man's] hand that looked like a gun," even though the suspect "had not brandished a weapon, spoken of a weapon, or threatened to use a weapon" and "in fact, did not have a weapon." 598 F.3d at 533, 538–39. *Espinosa* thus indicates that the provocation doctrine can apply here even though Mendez did not act violently in response to the deputies' entry.

The deputies also argue that they did not intentionally or recklessly violate Mendez's rights, a prerequisite to provocation liability. *See Billington*, 292 F.3d at 1189. But because qualified immunity "protects all but the plainly incompetent or those who knowingly violate the law," *Stanton*, 134 S. Ct. at 5 (citation and internal quotation marks omitted), our determination that the deputies are not entitled

to qualified immunity on the warrantless entry claim necessarily indicates that they acted recklessly or intentionally with respect to Mendez's rights. And the record here bears out Conley and Pederson's recklessness—without a reasonable belief of exigent circumstances, the deputies entered Hughes's property and proceeded to search a shack in an attempt to execute an arrest warrant for a parolee that, at most, *may* have been on the property, contrary to *Steagald*, 451 U.S. at 211–12, and *Johnson*, 256 F.3d at 907–08. Indeed, the deputies appear to have been simply "conduct[ing] warrantless searches while investigating a suspect's whereabouts," *id.* at 908, which *Johnson* explicitly forbids, *id.*, and *Welsh* prohibits by implication, 466 U.S. at 753.

Finally, even without relying on our circuit's provocation theory, the deputies are liable for the shooting under basic notions of proximate cause.[8] The Supreme Court has emphasized that § 1983 "should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions." *Malley v. Briggs*, 475 U.S. 335, 344 n.7 (1986) (quoting *Monroe v. Pape*, 365 U.S. 167, 187 (1961)). "Proximate cause is often explicated in terms of foreseeability or the scope of the risk created by the predicate conduct," and the analysis is designed to "preclude liability in situations where the causal link between conduct and result is so attenuated that the consequence is more aptly described as mere fortuity." *Paroline v. United States*, 134 S. Ct. 1710, 1719 (2014) (citations omitted).

---

[8]   This conclusion follows from the Mendezes' argument on cross-appeal that the district court erred by not awarding "reasonably foreseeable" damages jointly on all claims.

The district court here, discussing *District of Columbia v. Heller*, 554 U.S. 570 (2008), recognized that when many Americans own firearms "to protect their own homes[, a] startling entry into a bedroom will result in tragedy." The court also cited Justice Jackson's decades-old admonition in a case involving a warrantless entry:

> [T]he method of enforcing the law exemplified by this search is one which not only violates legal rights of defendant but is certain to involve the police in grave troubles if continued. . . . Many home-owners in this crime-beset city doubtless are armed. When a woman sees a strange man, in plain clothes, prying up her bedroom window and climbing in, her natural impulse would be to shoot. . . . But an officer seeing a gun being drawn on him might shoot first.

*McDonald v. United States*, 335 U.S. 451, 460–61 (1948) (Jackson, J.,concurring). Under these principles, the situation in this case, where Mendez was holding a gun when the officers barged into the shack unannounced, was reasonably foreseeable. The deputies are therefore liable for the shooting as a foreseeable consequence of their unconstitutional entry even though the shooting itself was not unconstitutionally excessive force under the Fourth Amendment. *See Billington*, 292 F.3d at 1190 ("[I]f an officer's provocative actions are objectively unreasonable under the Fourth Amendment, as in *Alexander*, liability is established, and the question becomes the scope of liability, or what harms the constitutional violation proximately caused.").

## VI

Lastly, Pederson argues that she cannot be held liable because she did not search the shack.  Pederson testified, however, that after clearing the sheds on the south side of the property, she told Sergeant Minster that she was "going to check the rest of the yard," including the shack.  Minster testified similarly.  Pederson also approached the shack with her weapon drawn alongside Conley.  It is inconsequential that only Conley opened the door and pulled the blanket back from the doorframe while Pederson stood by—under our case law, Pederson was an "integral participant" in the unlawful search because she was "aware of the decision" to search the shack, she "did not object to it," and she "stood armed behind [Conley] while he" opened the shack door.  *Boyd v. Benton County*, 374 F.3d 773, 780 (9th Cir. 2004).

## VII

Because we affirm the district court's conclusion that the deputies are liable for the shooting following their unconstitutional entry, the Mendezes' cross-appeal is waived, and we do not reach the issues therein.  The district court judgment is AFFIRMED insofar as it awards damages for the shooting and for the unconstitutional entry.  The award of $1 nominal damages for the knock-and-announce violation is REVERSED, and we remand for that nominal damages award to be vacated.

13-56686 is **AFFIRMED IN PART and REVERSED IN PART**; and 13-57072 is **DISMISSED AS MOOT.**