**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

APRIL SABBE, Individually and as
Personal Representative of the Estate
of Remi Sabbe, Deceased,

*Plaintiff-Appellant*,

v.

WASHINGTON COUNTY BOARD
OF COMMISSIONERS; PATRICK
GARRETT, in his individual capacity;
CHRIS BOWMAN, in his individual
capacity; CHAD LOTMAN, in his
individual capacity; EARL BROWN,
in his individual capacity; CADE
EDWARDS, in his individual
capacity,

*Defendants-Appellees*.

No. 21-35431

D.C. No. 3:19-cv-
02106-IM

OPINION

Appeal from the United States District Court
for the District of Oregon
Karin J. Immergut, District Judge, Presiding

Argued and Submitted May 9, 2022
Portland, Oregon

Filed October 17, 2023

Before:  Marsha S. Berzon, Richard C. Tallman, and
Morgan Christen, Circuit Judges.

Opinion by Judge Christen;
Partial Concurrence and Partial Dissent by Judge Berzon

---

## SUMMARY[*]

---

### Civil Rights/Deadly Force

The panel affirmed the district court's summary judgment for law enforcement officers in an action alleging, in part, that defendants violated Remi Sabbe's Fourth Amendment rights by entering his private property without a warrant, using an armored vehicle to intentionally collide with Sabbe's pickup truck while he was inside, and shooting and killing him.

Defendants responded to calls from Sabbe's neighbor that Sabbe was driving a pickup truck erratically on a rural field on his own property, that he was drunk and belligerent and may have fired a gun. An hour after thirty officers arrived at the property in marked police cars with their overhead lights on, defendants used an unmarked armored vehicle to twice execute a pursuit intervention technique ("PIT") maneuver by intentionally colliding with Sabbe's truck in the field. Officers reportedly shot Sabbe after they thought they heard a gunshot and saw a rifle pointed at them.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel first rejected plaintiff's argument that defendants violated Sabbe's Fourth Amendment rights by entering the property without a warrant.  Sabbe's response to the warrantless entry was a superseding cause of his death and unforeseeable given the circumstances.  Accordingly, the officers' decision not to obtain a warrant before entering the property—regardless of whether that decision constituted a Fourth Amendment violation—was not the proximate cause of Sabbe's death.

The panel next held that a jury could find that defendants' second PIT maneuver constituted deadly and excessive force because (1) it created a substantial risk of serious bodily injury, (2) Sabbe did not pose an imminent threat to the officers or others at that point, and (3) less intrusive alternatives were available.  Nevertheless, no clearly established law would have provided adequate notice to reasonable officers that their use of the armored vehicle to execute a low-speed PIT maneuver under these circumstances was unconstitutional.

The panel held that the district court correctly ruled that the officers were entitled to qualified immunity for shooting and killing Sabbe because the officers' split-second decision to open fire did not constitute excessive force.

Finally, the panel rejected plaintiff's failure-to-train claim against the County, finding that the record did not give rise to a genuine dispute that the County's failure to establish guidelines for using the armored vehicle to execute PIT maneuvers rose to the level of deliberate indifference.

Concurring in part and dissenting in part, Judge Berzon stated that, viewing the evidence in the light most favorable to Sabbe, he did not point a rifle or shoot at the officers, nor did the officers reasonably believe that he did.  Defendants

therefore were not entitled to summary judgment as to whether the fatal shooting of Sabbe was excessive force. Additionally, defendants' mode of entry onto Sabbe's property in an unmarked military vehicle was a proximate cause of his death. Although Judge Berzon concurred in the conclusion that a reasonable jury could find that the second PIT maneuver constituted excessive force, she would deny qualified immunity because a reasonable officer would have understood that the action was likely to cause death or serious injury. Finally, Judge Berzon agreed that the district court properly dismissed plaintiff's failure-to-train claim against the County.

## COUNSEL

Louren Oliveros (argued), Oliveros Law PLLC, Uniondale, New York, for Plaintiff-Appellant.

Scott W. Davenport (argued), Jones & Mayer, Fullerton, California; Eugene P. Ramirez, Manning & Kass Ellrod Ramirez Trester LLP, Los Angeles, California; Tom Carr, County Counsel, Office of Washington County Counsel, Hillsboro, Oregon; for Defendants-Appellees.

**OPINION**

CHRISTEN, Circuit Judge:

Just after lunchtime on January 12, 2018, Lloyd Wetzel called the Washington County Sheriff's Office (WCSO) to report that someone was driving a pickup truck erratically and "making a mess of" a rural field owned by his neighbor, Remi Sabbe. Within a few minutes, Wetzel called back to say that Sabbe was the person driving the truck, that Sabbe was "solid drunk" and "belligerent," and that Wetzel thought he might have heard a gunshot. Within about an hour, approximately thirty law enforcement officers pulled up to the property in marked police cars with their overhead lights on, with the intention of making their presence known. An hour after that, two armored vehicles entered Sabbe's field. The officer driving the unmarked Commando V150 armored personnel carrier later testified that the officers' objective was to communicate with Sabbe, but the eight officers inside the V150 had no way to do that. Instead, the V150—which weighs several times as much as a typical police cruiser—twice executed a PIT maneuver, intentionally colliding with Sabbe's pickup, crushing the truck's body and spinning it around in an attempt to stop the truck by causing its engine to stall.[1] Moments later, officers heard a gunshot. Several officers opened fire. One of the officers reported seeing Sabbe maneuvering a rifle toward them before he shot at

---

[1] To execute a pursuit intervention technique (PIT) maneuver, officers deliberately collide their vehicle into the back half of either side of a target vehicle. By rotating the target without reversing its direction of travel, the aim of a PIT maneuver is to reverse the target's drive train and cause its engine to stall. *See Longoria v. Pinal County*, 873 F.3d 699, 703 n.2 (9th Cir. 2017).

Sabbe, and another officer reported seeing Sabbe pointing a rifle at them before he shot at Sabbe. Sabbe was shot eighteen times and died at the scene.

Sabbe's widow, April, brought this civil suit seeking damages from the officers and the County pursuant to 42 U.S.C. § 1983 and state law. She alleges Defendants violated her husband's Fourth and Fourteenth Amendment rights by entering the family's private property, ramming Sabbe's pickup with the V150, and shooting him. The district court granted summary judgment for Defendants. Even viewing the facts in the light most favorable to Plaintiff, the court held that the officers' conduct neither violated Sabbe's constitutional rights nor exceeded the scope of their qualified immunity.

April Sabbe asks us to reverse the district court's decision and remand so her claims may proceed to trial. We decline to do so because we conclude: (1) even if the warrantless entry into the Sabbes' property was unlawful, it was not the legal cause of Sabbe's death; (2) a jury could find that the second PIT maneuver constituted deadly and excessive force, but no clearly established law would have provided adequate notice to reasonable officers that it violated Sabbe's federally guaranteed rights; and (3) under the circumstances presented here, the officers' split-second decision to open fire did not constitute excessive force.

## BACKGROUND

Remi Sabbe and his brother Kevin were the primary caretakers of eighty-four acres of rural land that their family owns on the outskirts of Sherwood, Oregon. Much of the Sabbes' property is an open field, but it also contains heavily wooded areas, a barn, a driveway blocked with a chain and marked with a "Private Property, No Trespassing" sign, and

the brothers' childhood home. The property abuts two county roads. The Sabbe family hunted together in the area, and their neighbor Lloyd Wetzel has a few duck blinds.

On January 12, 2018, at approximately 1:33 PM, Wetzel called 911 to report that someone was "screwing around" in a pickup truck on the Sabbes' property and "making a mess of it." Sherwood Police Officer Jentzsch was dispatched and arrived at the Sabbes' property. Fifteen minutes after his first call, Wetzel called 911 again, this time identifying the truck's driver as his neighbor, Remi Sabbe, whom he described as "solid drunk" and "belligerent." Wetzel reported that he might have heard a gunshot and that Sabbe "may have a rifle."

Dashcam video from Jentzsch's Police SUV captures his view of the scene. When he arrived, Jentzsch pulled to the shoulder of a road running parallel to one side of the property, about 10 meters from where Sabbe's vehicle was stopped in the field. Almost as soon as Jentzsch arrived, the truck backed away from the road and moved deeper into the field. Jentzsch watched the truck drive slowly but erratically in the field and hit a tree at a distance Jentzsch estimated to be about 300 yards. An audio recording and a Computer Aided Dispatch (CAD) report provide a detailed record of the radio traffic that followed.[2]

At 1:52 PM, Jentzsch reported to dispatch that Sabbe had left the truck on foot and that Jentzsch had heard a few shots, but could not tell if it was Sabbe or what was "going on."

---

[2] We consult both the recording and CAD report because they were both before the district court and complement each other. The recording provides a more comprehensive account of what the officers saw and heard, while the CAD report includes timestamps that allow us to create a chronology of how the events unfolded.

Jentzsch also relayed that Sabbe "might have [a] rifle," and later testified that he saw Sabbe holding something "long and black" horizontally across his waist that he was pointing in the direction of the intersection. Jentzsch could not say for certain that he had seen Sabbe possess a weapon, nor did Jentzsch ever turn on his lights or sirens to announce his presence to Sabbe or attempt to communicate with him. In fact, Jentzsch radioed in that he was trying to avoid being seen.

At 2:05 PM, after about twenty minutes of observation, Jentzsch reported that he had lost sight of Sabbe. Additional officers responded, set up a command post about a mile-and-a-half away at Al's Garden Center, and began to block the roadways along the perimeter of the property. Sergeant Bowman, the officer in command, ordered two armored vehicles to the scene: a Lenco BearCat armored SWAT truck ("BEAR"), and the Commando V150 armored personnel carrier.

To the untrained eye, the V150 resembles a tank. Originally owned by the Navy, it stands about seven-and-a-half feet tall and wide and it is over twenty feet long. Unloaded, it weighs eight-and-a-half tons. Its steel hull and vision ports are built to withstand munitions up to .30 caliber. Both armored vehicles arrived at around 3:00 PM as a new officer, Lieutenant Lotman, took command.

Though Sabbe's truck remained in sight and stationary in the field for over an hour, the officers did not know Sabbe's location. In that time, officers attempted to shut down the public roads abutting the property and placed nearby schools on lockdown. However, traffic continued to flow nearby. A media helicopter arrived and noise from the helicopter made it difficult for officers to hear each other

over their radios. Officers also spoke with Kevin and April Sabbe and learned that Sabbe was upset about a recent burglary at the house, that he was not violent but probably scared, that Sabbe had been drinking the night before and earlier in the day, and that he had been so angry that he broke his cell phone. April said that her husband's truck could be disabled remotely with OnStar, a vehicle telematics system.[3] She also reported that her husband had a gun in his truck (she did not know what type), that he "d[id] not like police," and that he had a history of "elud[ing]" them. Lieutenant Lotman relayed some of this information over the radio, telling officers that Sabbe was there "to protect his property." There is no indication that the officers sought a warrant for Sabbe's arrest.

At some point after 3:23 PM but before 3:28 PM, officers spotted movement inside the truck. The officers in the V150 radioed Lotman to ask if he wanted them to "go after the vehicle." At 3:29 PM, Lieutenant Lotman—relying on radio communications from officers on the scene and possibly under the impression that Sabbe's pickup was moving— asked the occupants of the armored vehicles, "Can you block it?" apparently referring to Sabbe's truck. The officers in the vehicles seem to have interpreted this as an order to enter the property because neither the recording nor the CAD report reflects that anyone answered. Instead, the officers in the BEAR and the V150 announced that they were moving into the property from the driveway. As the V150 moved toward Sabbe, Lieutenant Lotman did not order the officers to stop, but when asked, "[W]hat crimes [do] we have[?]" Lotman

---

[3] The district court noted that April relayed this information to WCSO but the record does not include any evidence that resolves whether the OnStar system could in fact have been used to disable the truck.

responded that Sabbe was suspected of "unlawful use of a weapon." A voice can be heard on the radio informing the officers in the V150 that Sabbe was "heading at you," but it is otherwise unclear how the vehicles were moving in relation to each other.

Unlike the V150, the BEAR armored SWAT truck had police markings and was equipped with a public address system, but it got stuck in the mud just after entering the field. The V150 was able to drive on the muddy terrain, but it lacked police markings and a public address system, and the V150's red and blue emergency lights were not visible. Sergeant Braun, who is not a defendant, was driving the V150 when it collided with Sabbe's truck. He also was an Emergency Vehicle Operations Course instructor and trained other officers on how to operate the County's specialized vehicles. Sergeant Braun was designated pursuant to Federal Rule of Civil Procedure 30(b)(6) to testify regarding the County's training, use, and deployment of the V150. He testified that the officers' objective when the two armored vehicles entered the field was to communicate with Sabbe, but only the V150 was able to approach the pickup and, as explained, it had no public address system. There is no indication that Defendants considered calling the V150 back from the field after the BEAR got stuck to allow time for a bullhorn or other public address system to be brought to the scene.

The news helicopter captured the following events on video.[4] The truck and the V150 first drove toward each other on a collision course, and narrowly avoided a head-on impact because Sabbe slightly veered and the V150 appears

---

[4]    This video may be viewed at the following link: https://cdn.ca9.uscourts.gov/datastore/opinions/media/SabbeVideo.mp4.

to have braked. An unidentified voice on the radio—likely one of the officers in the armored vehicle—can be heard saying that Sabbe "just rammed the V150." Though a head-on collision was avoided, the front ends of the two vehicles collided. Sabbe was able to continue on his course away from the armored personnel carrier. Sergeant Braun testified that, from inside the V150, he perceived that Sabbe had intentionally rammed the V150 and the officers' objective changed at this point, from communication to apprehension. The V150 turned to follow Sabbe and executed a PIT maneuver in an effort to stop his pickup. Sergeant Braun later testified that PIT maneuvers are generally conducted using squad cars, and the use of the V150 to execute one was unprecedented. According to Sergeant Braun, the officers' efforts to stop Sabbe in his field with the V150 marked "the first time, as an [Emergency Vehicle Operations Course] instructor, that I've ever seen or heard of a piece of armor being used to . . . perform a PIT maneuver." He also testified that he had not received any training on how or whether to carry out PIT maneuvers with an armored vehicle, and that doing so was "not something we ever thought of, [and] not something we've ever addressed under policy."

The V150 struck Sabbe's truck near the left rear wheel, spinning the truck about 180 degrees on its axis and crushing the rear truck bed. But the pickup's engine did not stall, and Sabbe drove away from the V150 and brought his truck to a complete stop in the field. As he opened the door and attempted to exit, the officers executed another PIT maneuver into the passenger side of the pickup where the cab meets the truck bed, crushing the point of impact and causing the driver's door to slam into Sabbe's left leg. The V150 continued to push into the front passenger side, rotating the truck again, this time approximately 270

degrees. Inside the armored V150, Corporal Edwards thought he heard a gunshot, and recalled hearing Sergeant Braun say either "He's pointing a rifle at us" or "He's shooting at us." Edwards leaned out the V150's side opening, saw that Sabbe appeared to be "maneuvering the rifle to point out the passenger side" of his truck, and fired one shot at Sabbe. Deputy Brown testified that as he emerged from a hatch on top of the V150, he heard Braun yell something to the effect that Sabbe was aiming his rifle at them, then heard a gunshot and saw Sabbe's rifle pointing at the officers. Deputy Brown fired multiple shots at the truck's passenger side windows. Braun, who was driving the V150, testified that his first impression was glass exploding out away from the truck, then the sound of shots fired by the other officers. Officers rushed into the field and found Sabbe in his truck with 18 gunshot wounds to his chest, abdomen, and arms. Officers found that Sabbe was armed with an AR-15 rifle. Medics pronounced Sabbe dead at the scene. There is no evidence the officers directly communicated with Sabbe at any point.

April Sabbe sued the County, the sheriff, and Officers Bowman, Lotman, Brown, and Edwards pursuant to 42 U.S.C. § 1983, *Monell v. Department of Social Services*, 436 U.S. 658 (1978), and state law. Her complaint alleged that Defendants violated Sabbe's rights by entering the property without a warrant, ramming his truck with the V150, and shooting him to death. Defendants moved for summary judgment, and the district court granted Defendants' motion, dismissing all of the federal claims and declining to exercise supplemental jurisdiction over the state-law claims. In doing so, the district court concluded that none of the officers' actions violated Sabbe's federally guaranteed rights and that they were entitled to qualified immunity. April Sabbe

appeals the order granting summary judgment on the unlawful entry, excessive force, and *Monell* claims, but not dismissal of the Fourteenth Amendment substantive due process or state-law claims.

## DISCUSSION

We review the district court's rulings on summary judgment de novo. *Donell v. Kowell*, 533 F.3d 762, 769 (9th Cir. 2008). We view the facts in the light most favorable to the nonmovant, but are "limited to considering what facts the officer[s] could have known at the time of the incident." *Est. of Lopez ex rel. Lopez v. Gelhaus*, 871 F.3d 998, 1006 (9th Cir. 2017) (quoting *Davis v. United States*, 854 F.3d 594, 598 (9th Cir. 2017)). Our analysis proceeds from the perspective of a "reasonable officer on the scene" and must "allow for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Plumhoff v. Rickard*, 572 U.S. 765, 775 (2014) (alteration accepted) (quoting *Graham v. Connor*, 490 U.S. 386, 396–97 (1989)). When a victim dies in a police officer shooting, we carefully examine "all the evidence in the record," including circumstantial evidence, to "ensure that the officer[s are] not taking advantage of the fact that the witness most likely to contradict [their] story—the person shot dead—is unable to testify." *Gonzalez v. City of Anaheim*, 747 F.3d 789, 795 (9th Cir. 2014) (en banc) (quoting *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994)). However, "we do not credit a party's version of events that the record, such as an unchallenged video recording of the incident, quite clearly contradicts." *Williamson v. City of Nat'l City*, 23 F.4th 1146, 1149 n.1 (9th Cir. 2022) (internal quotation marks and

alteration omitted) (quoting *Rice v. Morehouse*, 989 F.3d 1112, 1120 (9th Cir. 2021)).

## I.

April Sabbe's first argument is that Defendants violated her husband's Fourth Amendment rights by entering the Sabbes' field without a warrant. "The Fourth Amendment ordinarily requires that police officers get a warrant before entering a home without permission. But an officer may make a warrantless entry when the 'exigencies of the situation' create a compelling law enforcement need." *Lange v. California*, 141 S. Ct. 2011, 2016 (2021) (quoting *Kentucky v. King*, 563 U.S. 452, 460 (2011)). Here, we need not parse whether circumstances justified warrantless entry into the Sabbes' field or whether the field qualifies as the curtilage of Remi Sabbe's home, because even if the entry violated the Fourth Amendment, that violation was not the proximate cause of Sabbe's death. *See Harper v. City of Los Angeles*, 533 F.3d 1010, 1026 (9th Cir. 2008) (noting that a § 1983 plaintiff must demonstrate "the defendant's conduct was the actionable cause of the claimed injury," a showing that requires establishing "both causation-in-fact and proximate causation").

The dissent argues we may not affirm on this basis because the proximate cause inquiry is relevant only to determining damages, not liability. The dissent's implied assertion is that April Sabbe is permitted to raise a claim for nominal damages based on the warrantless entry itself. To be sure, a § 1983 plaintiff who cannot show actual damages may still raise a claim for nominal damages. *See, e.g.*, *Draper v. Coombs*, 792 F.2d 915, 922 (9th Cir. 1986) (concluding that where "complaint stated valid section 1983 claims for nominal damages," dismissal for lack of actual

damages was improper). But April Sabbe did not raise a claim for nominal damages. Further, Ms. Sabbe did not argue she was entitled to nominal damages in the district court, and she does not argue for such relief on appeal. Instead, April Sabbe premises her warrantless entry claim—like all three of her Fourth Amendment claims—exclusively on Remi Sabbe's death. Because April Sabbe did not raise a claim for nominal damages, we need not consider such a claim's merits.[5]

"The proximate cause question asks whether the unlawful conduct is closely enough tied to the injury that it makes sense to hold the defendant legally responsible for the injury." *Mendez v. County of Los Angeles*, 897 F.3d 1067, 1076 (9th Cir. 2018). Where "the injury was actually brought about by a later cause of independent origin that was not foreseeable," that superseding cause cuts off the chain of causation. *See Exxon Co., U.S.A. v. Sofec, Inc.*, 517 U.S. 830, 837 (1996) (citation omitted). Overall, "[t]he touchstone of proximate cause in a § 1983 action is foreseeability." *Phillips v. Hust*, 477 F.3d 1070, 1077 (9th Cir. 2007), *vacated on other grounds*, 555 U.S. 1150 (2009).

---

[5] Neither of the cases cited by the dissent, *Floyd v. Laws*, 929 F.2d 1390 (9th Cir. 1991), and *George v. City of Long Beach*, 973 F.2d 706 (9th Cir. 1992), compels a contrary conclusion. The *Floyd* plaintiff, who sought actual and nominal damages, proved the defendants caused a violation of her rights at trial, but failed to prove any actual damages. *See Floyd*, 929 F.2d at 1400-02. Our court held it was error for the district court to refuse to award nominal damages and to enter judgment for the defendants. *Id.* at 1402. In *George*, our court again held it was error for a district court to refuse to award nominal damages and to enter judgment for defendants after a plaintiff—who sought both actual and nominal damages—proved a constitutional violation. *George*, 973 F.2d at 708. But April Sabbe did not seek nominal damages in the district court, and does not argue on appeal that she is entitled to pursue them.

Defendants argue that Sabbe initiated the first collision between the V150 and the pickup and that this alone was the superseding cause of Sabbe's death.  But as explained, video footage from the hovering helicopter provides a bird's-eye view of both vehicles heading toward each other and both taking some evasive action before the first collision.  *See Williamson*, 23 F.4th at 1149 n.1.  On appeal, we view the video in the light most favorable to Sabbe.  This standard defeats Defendants' theory that Sabbe initiated the first, relatively minor collision with the V150, and the related conclusion that the initial collision, which Defendants attribute solely to Sabbe, was the superseding cause of Sabbe's death.

However, we agree with Defendants that the record does not give rise to a genuine dispute about whether Corporal Edwards or Deputy Brown reasonably perceived that Sabbe rammed the V150 or pointed a rifle and shot at the officers after the PIT maneuvers.  *See Mendez*, 897 F.3d at 1076.  Because Sabbe's response to the warrantless entry was surely a superseding cause of his death, we conclude that the officers' decision not to obtain a warrant before entering the property—regardless of whether that decision constituted a Fourth Amendment violation—was not the legal cause of Plaintiff's claimed injury.

The dissent, relying on our decision in *Mendez*, argues that Sabbe's actions cannot be a superseding cause because Sabbe's conduct was a foreseeable consequence of Defendants' entry into the field.  *Mendez* is inapposite.  In *Mendez*, officers made an unannounced entry into a residence, surprised the sleeping victim, and mistakenly perceived as a threat his innocent act of moving a BB gun to sit up in bed.  *See id.* at 1081–82.  We reasoned that the foreseeability of alert officers misperceiving a sleeping

victim's response to an unannounced entry was "among the reasons why entry into a home by armed police officers with weapons drawn is dangerous." *Id.* at 1081.  We concluded there was "nothing extraordinary about the possibility that officers might mistake an innocent implement for a threat." *Id.* at 1082.  In the dissent's view, like the victim in *Mendez*, Sabbe's conduct was a foreseeable consequence of Defendants' warrantless entry into the field.[6]

The situation here is materially different from *Mendez*. Sabbe was not abruptly awoken from sleep in his residence. Rather, he created a disturbance by driving his truck erratically while drunk and in possession of a firearm.  His actions understandably prompted a neighbor's initial concerned call to the police to report that someone was "making a mess" of the Sabbes' field.  The neighbor called back a few minutes later to report that Sabbe was "solid drunk," "belligerent" and "may have a rifle."  The police response followed.

The foreseeable consequences of entering a residence with guns drawn—as in *Mendez*—are not at all comparable to those present here, principally because Sabbe was not surprised by the police and because he was in a large field. The police made their presence known before they entered the property.  Dashcam video confirms that Jentzsch pulled his Police SUV to within about 10 meters of Sabbe's vehicle, and that Sabbe immediately backed away in response.  Later,

---

[6] To the extent the dissent argues that Defendants misperceived Sabbe's actions and their incorrect perceptions were predictable consequences of the entry, we agree we are obliged to assume Sabbe neither shot first nor aimed his AR-15 rifle at Defendants.  But as we explain, the record does not give reason to question the reasonableness of the officers' *perception* that Sabbe intentionally rammed them and aimed his rifle at them, even if we assume he did not actually do so.

numerous marked police cars pulled up to the perimeter of the Sabbes' field with their overhead lights flashing. The BEAR with police markings and the unmarked V150, both vehicles likely to be possessed only by governmental authorities, were visible from Sabbe's truck. A news helicopter hovered loudly overhead. In light of the conspicuous and protracted police presence around the perimeter of the field, we cannot say that Sabbe's response was the foreseeable result of Defendants' entry. Put differently, Defendants' warrantless entry into the field was not "closely enough tied" to Sabbe's death that it makes sense to hold Defendants legally responsible for Sabbe's death.[7] *See Mendez*, 897 F.3d at 1076.

The dissent argues that in order to constitute a superseding cause, Sabbe must have actually pointed his gun or fired at the officers, because only intentional acts may serve as superseding causes. But again the dissent relies on *Mendez*, which does not support that proposition, and we know of no authority that does. Nor does *Mendez* suggest that the reasonable misperception of innocent acts can never constitute a superseding cause. Under the dissent's view, an officer would not be entitled to qualified immunity if he or she misperceived an innocent gesture, so long as that misperception bore some connection to earlier conduct alleged to be a Fourth Amendment violation. We know that is not the case. *See Bonivert v. City of Clarkston*, 883 F.3d 865, 872 (9th Cir. 2018) (noting that qualified immunity "protects an officer who reasonably, but mistakenly,

---

[7] For these reasons, we are not persuaded by the dissent's view that Sabbe's anger with a recent burglary likens him to a citizen defending his home.

perceives facts that would have made his actions lawful had they been true").

Boiled down, the dissent argues that Defendants' "disproportionate," "aggressive mode of entry" proximately caused Sabbe's death. But in making this argument, the dissent harkens back to the "provocation rule," where an officer's intentional or reckless provocation of a violent confrontation created an excessive force claim for what would otherwise be a reasonable use of force. *Mendez v. County of Los Angeles*, 815 F.3d 1178, 1198 (9th Cir. 2016), *rev'd*, 581 U.S. 420 (2017). The Supreme Court eliminated the provocation rule, and we are not free to rely on it. *Mendez*, 581 U.S. at 428, 432.

Our conclusion that April Sabbe failed to create a genuine dispute that Defendants' warrantless entry into the field proximately caused Remi Sabbe's death ends our analysis of the first claim.

## II.

April Sabbe next argues that the officers violated her husband's constitutional rights when they used the V150 to execute multiple PIT maneuvers in an attempt to stop his truck. Sergeant Braun was driving the V150, but, as noted, he is not a defendant. The complaint alleges that "the Supervisory Defendants [including Bowman and Lotman] gave an order to use the [V150] to disable the Sabbe truck using a PIT maneuver." *See Peck v. Montoya*, 51 F.4th 877, 891 (9th Cir. 2022) (explaining that a defendant may be held liable under § 1983 "if (1) the defendant knew about and acquiesced in the constitutionally defective conduct as part of a common plan with those whose conduct constituted the violation, or (2) the defendant set in motion a series of acts by others which the defendant knew or reasonably should

have known would cause others to inflict the constitutional injury").

A court's order granting qualified immunity at the summary judgment stage is improper only if the facts, viewed in the light most favorable to the plaintiff, show that a defendant's conduct violated a constitutional right and that right was "clearly established" at the time of the defendant's action. *See, e.g.*, *Seidner v. de Vries*, 39 F.4th 591, 595 (9th Cir. 2022). Because a negative answer at either step would entitle defendants to qualified immunity, we are "permitted to exercise [our] sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

Principles of constitutional avoidance demand that we "think hard, and then think hard again" before reaching constitutional questions, but reaching them can be necessary to "give guidance to officials about how to comply with legal requirements," especially when resting our decision solely on the "clearly established" prong of qualified immunity would "frustrate 'the development of constitutional precedent' and the promotion of law-abiding behavior." *Camreta v. Greene*, 563 U.S. 692, 706–07 (2011) (quoting *Pearson*, 555 U.S. at 237).[8]

This appeal—and particularly the officers' use of the V150—exemplifies the circumstances in which it is important to provide guidance. It is now common for law

---

[8] In *Pearson*, the Supreme Court articulated factors that counsel in favor of and against deciding constitutional questions in qualified immunity cases. 555 U.S. at 236–42. In determining whether to exercise our discretion, we have considered each of them.

enforcement agencies to possess and use armored vehicles, many of which have been decommissioned from military service, and we have never addressed the degree of force involved in the use of these vehicles in a civilian setting. The mismatch between the ubiquity of these vehicles and the paucity of case law concerning their use is illustrated by the facts of this case. Washington County publicly reported deploying its armored vehicles over 100 times in the first eight months of 2021 alone—about once every two to three days.[9] Yet Sergeant Braun testified that the officers had received no training on how to use an armored vehicle to execute a PIT maneuver because it was "not conceivable" and "not something we've ever addressed under policy." Because armored vehicles are now frequently employed by civilian law enforcement agencies, acknowledging the quantum of force at issue when they are used to conduct PIT maneuvers will provide guidance as agencies formulate policies and train officers to use armored vehicles in ways that promote public safety without exceeding constitutional bounds.[10] Having thought hard and then thought hard again,

---

[9] Washington County, *Proposed Budget Summary, Fiscal Year 2022–23*, at 22 (2022), https://perma.cc/BS9R-BC7W; *see* Fed. R. Evid. 201(b)(2) & (c)(1).

[10] Under Section 1033 of the National Defense Authorization Act of 1997, "State agencies" are broadly authorized to participate in a permanent program that allows them to acquire military hardware from the Department of Defense (DoD) "suitable for use by the agencies in law enforcement activities." National Defense Authorization Act for Fiscal Year 1997, Pub. L. No. 104-201, § 1033, 110 Stat. 2422, 2639 (1996) (codified as amended at 10 U.S.C. § 2576a). Since the program's inception, DoD has transferred approximately $7.6 billion of surplus military property to state and local law enforcement agencies. *1033 Program FAQs*, Defense Logistics Agency (2023), https://perma.cc/4DT5-HZY6 (valuing the decommissioned assets at

we consider the constitutional implications of the V150 PIT maneuvers before deciding whether April Sabbe's § 1983 claim based on these alleged violations is barred by qualified immunity.

A.

The Fourth Amendment enshrines the right to be free from unreasonable seizures, *Torres v. Madrid*, 141 S. Ct. 989, 995 (2021), so the first question is whether the intentional use of the V150 to collide with Sabbe's pickup in the hope of stopping it constituted a seizure, *see Villanueva v. California*, 986 F.3d 1158, 1165 (9th Cir. 2021). We conclude that it did. A person is seized by "the application of physical force" with the "intent to restrain." *Torres*, 141 S. Ct. at 1003. Under that well-established standard, the officers seized Sabbe when they executed the PIT maneuvers with the V150. Sergeant Braun testified that the objective of a PIT maneuver is to spin the target vehicle around, reverse its drive train, and "stall the motor out." The video leaves no question that the V150 PIT maneuvers changed the direction of the truck's movement, turning it around twice and considerably damaging it. Even though Sabbe was able to continue driving, he was still "seized" within the meaning of the Fourth Amendment because the officers applied

---

original acquisition value). Even excluding unpublished dispositions, several of our published opinions have observed the use of armored vehicles like the BEAR and V150 by civilian authorities. *See, e.g.*, *Idaho v. Horiuchi*, 215 F.3d 986, 997, 999 (9th Cir. 2000) (Kozinski, J., dissenting), *vacated as moot*, 266 F.3d 979 (9th Cir. 2001); *Long v. City & County of Honolulu*, 511 F.3d 901, 905, 908 (9th Cir. 2007); *Fisher v. City of San Jose*, 558 F.3d 1069, 1073 (9th Cir. 2009); *Blight v. City of Manteca*, 944 F.3d 1061, 1064–65 (9th Cir. 2019). We express no view on the merits of the Section 1033 Program and police departments' use of armored vehicles in general.

physical force with the intent to restrain his liberty.  *See id.* at 999.

The next question is whether the force Defendants used in their attempt to stop Sabbe's truck was excessive, or whether the PIT maneuvers were objectively reasonable under the circumstances.  *Graham v. Connor* provides the framework that governs this part of our inquiry.  490 U.S. 386 (1989).  Resolving all genuine disputes of material fact in Plaintiff's favor, *Graham* requires that we consider "the severity of the intrusion on the individual's Fourth Amendment rights by evaluating the type and amount of force inflicted" and "the government's interest in the use of force."  *Seidner*, 39 F.4th at 596 (quoting *Williamson*, 23 F.4th at 1151).  We balance these two factors to determine whether the government's use of force was excessive.  *See id.*

1.

To gauge the type and amount of force used, we assess both "the risk of harm and the actual harm experienced."  *Nelson v. City of Davis*, 685 F.3d 867, 879 (9th Cir. 2012).  The greater the risk of harm and the actual harm involved, the greater the governmental interest must be to justify the use of force.  *See Headwaters Forest Def. v. County of Humboldt*, 276 F.3d 1125, 1130 (9th Cir. 2002).  In accord with our sister circuits, we have defined "deadly force" as any force that "*creates a substantial risk* of causing death or serious bodily injury."  *Smith v. City of Hemet*, 394 F.3d 689, 706 (9th Cir. 2005) (en banc) (emphasis added).  Deadly force is the most severe intrusion on Fourth Amendment interests because a person has a "fundamental interest in his own life."  *Tennessee v. Garner*, 471 U.S. 1, 9 (1985).

The district court recognized "the obvious reality that PIT maneuvers can be highly dangerous" and acknowledged the "potential heightened risks" posed by attempting a PIT maneuver with an armored personnel carrier as opposed to a typical police patrol car.  But the court concluded that the maneuvers did not rise to the level of deadly force because the pickup and the V150 were not "moving at high speeds" and it appeared that Sabbe was not injured, at least by the first PIT maneuver, because the video shows him attempting to get out of his truck just before the V150 executed the second PIT maneuver. *See Bryan v. MacPherson*, 630 F.3d 805, 824–25 (9th Cir. 2010) (observing that actual harm caused "is certainly relevant" in evaluating the degree of force officers used).

The record provides powerful evidence of the risk of harm posed by the PIT maneuvers.  Sergeant Braun, the County's Rule 30(b)(6) deponent, acknowledged in his testimony that there are circumstances in which a PIT maneuver executed with the V150 would be "highly probable to result in great bodily injury or death."  Sergeant Braun testified that "a thousand different variables," including both speed and size of the vehicles, affect the force involved in a PIT maneuver.

The video shows that the V150 executed the first PIT maneuver by colliding with the bed of Sabbe's truck at low speed as he drove across an open field.  The V150 did not make contact with the passenger cab, but even at low speed, the impact bent the truck's bed inward, mangled the tailgate, and partially detached the rear bumper.  The collision spun the truck 180 degrees but did not disable it and Sabbe drove away.  While it appears this first PIT maneuver damaged Sabbe's truck more severely than might have been expected had it had been executed with a regular police cruiser under

similar circumstances, it is not clear that a reasonable jury could find it constituted deadly force. *Cf. Scott v. Harris*, 550 U.S. 372, 375, 384 (2007) (concluding that deputy used deadly force when he rammed a vehicle off the roadway during a pursuit at speeds of 85 miles per hour, sending it down an embankment and rendering the plaintiff a quadriplegic).

However, we respectfully disagree with the district court's determination that a jury could not find that the second PIT maneuver presented a substantial risk of at least serious bodily injury. The video shows that Sergeant Braun executed a second PIT maneuver by driving the V150 into the passenger side of Sabbe's truck, after Sabbe had come to a complete stop and was trying to exit the truck from the driver's door.[11] The impact caused the door to swing shut on Sabbe's leg and pushed his truck sideways across the field. The force from the second PIT maneuver was enough to spin the truck on its axis about 270 degrees.

We evaluate force based on "its capacity for causing serious harm." *Nelson*, 685 F.3d at 885 (emphasis omitted). Under our case law, a jury could decide that the second V150 PIT maneuver constituted the use of deadly force because it created a substantial risk of serious bodily injury.[12]

---

[11] Because the V150 collided with Sabbe's truck on the passenger side, it is not clear whether the officers in the V150 could have perceived the increased risk of executing a PIT maneuver while Sabbe was trying to exit from the vehicle's driver's side.

[12] We do not suggest that PIT maneuvers generally or other vehicle-to-vehicle tactics necessarily or categorically create a substantial risk of serious bodily injury. *See* Crim. Just. Testing & Evaluation Consortium, Nat'l Inst. Just., *Vehicle Stoppage and Pursuit Management for Law Enforcement Agencies* 8 (May 2022),

2.

The government's interest in the use of force differs depending on: (1) the severity of the crime; (2) whether the suspect posed an immediate threat to the safety of the officers or others; and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight. *Williamson*, 23 F.4th at 1153; *see Graham*, 490 U.S. at 396–97. "[T]hese factors are not exclusive; they must be considered under the totality of circumstances, including whether 'less intrusive alternatives' were available to law enforcement and whether the suspect was given 'proper warnings' before force was used." *Seidner*, 39 F.4th at 599 (quoting *Rice*, 989 F.3d at 1121–22). The "immediate threat" factor is the most important. *Isayeva v. Sacramento Sheriff's Dept.*, 872 F.3d 938, 947 (9th Cir. 2017) (quoting *S.B. v. County of San Diego*, 864 F.3d 1010, 1013 (9th Cir. 2017)).

Even when a suspected felon is fleeing arrest, an officer's use of deadly force is reasonable if it is "necessary to prevent . . . escape and the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *Garner*, 471 U.S. at 3. Plaintiff argues that Sabbe posed no threat to the officers when they initiated the PIT maneuvers because the officers were in an armored vehicle. This suggests that even if a bullet had been fired at the V150, it would not have posed

---

https://cjtec.org/files/64bfb22b75393 [https://perma.cc/TPY4-W5EP] ("[A]gencies commonly recommend that the maneuver be performed at slower speeds (35 to 45 mph) unless authorized for use of deadly force."). The degree of force represented by any given vehicle-to-vehicle tactic will necessarily depend on the totality of the circumstances.

a threat to the eight officers inside.  We disagree.  The V150's armor is rated for munitions .30 caliber and below, but AR-15 platform rifles like the one Sabbe possessed are commercially available in considerably higher calibers.[13] The responding officers had good reason to suspect that Sabbe was armed, but they had no way of knowing what type of gun he possessed.  As such, the V150 reduced the risk of harm to the officers but it did not eliminate it.  Further, in addition to indications that Sabbe was armed, the officers had reason to believe he was drunk and angry, and that he may have fired a weapon or pointed one toward an intersection about an hour and forty minutes before the officers entered the field.  Despite the officers' attempts to block off the public roadway, traffic continued to pass by on the road abutting the edge of the property.[14]

Defendants urge us to conclude that the government had a heightened interest in using force because Sabbe threatened the officers' safety by initiating the first collision between his truck and the V150.  Specifically, Defendants argue that Sabbe "drove right at the V150 and rammed into it."   Defendants' contention is inconsistent with the summary judgment standard.  Although occupants of the V150 perceived that Sabbe rammed them with his pickup,

---

[13] *See, e.g.*, Tom McHale, *.50 Beowulf AR-15: A Home Defense Option?*, Shooting Illustrated (Nov. 24, 2017), https://perma.cc/87GN-X9FX.

[14] The dissent acknowledges that radio traffic from 3:23 PM confirmed there was still a "steady flow of traffic" passing by less than minutes before the first PIT maneuver occurred.  The dissent assumes, based on Sergeant Bowman's testimony, that this traffic was successfully shut down before the PIT maneuvers.  The dissent's supposition is unsupported.  Bowman testified that he could not recall when traffic had been successfully shut down; he recalled only that it was shut down "shortly after" a radio call about "civilian traffic coming through."

the video shows that the pickup and the V150 first headed toward each other on a collision course, and that Sabbe's truck veered off slightly and the V150 braked in time to avoid a head-on collision. We are required to view the facts in the light most favorable to Sabbe, and we cannot say that the video shows that Sabbe initiated the first collision, nor that the V150 was the only vehicle that appears to have taken steps to avoid it.

When we consider the risk that Sabbe posed to the officers' safety, we first observe that Sabbe's initial reaction to seeing Jentzsch's marked police car near his fence line was to reverse the truck and *retreat* into his own field. Sabbe was reported to be driving erratically and tearing up the muddy field, but he was on his own property, not on a public roadway, during the entire encounter. And because Sabbe had not been given any directions by the officers, this was not a situation in which he was failing to comply with a lawful order. Notably, Sergeant Bowman agreed in his deposition testimony that "driving the vehicle" around on the property, "without more," such as driving on the public roadway, was "not a threat." Though Defendants had reason to believe that Sabbe was armed and intoxicated, that he may have discharged a weapon on his property approximately an hour and forty minutes earlier in a manner that threatened public safety, and that he intentionally rammed the V150, there is no indication he had fired from the pickup or pointed a gun in the direction of the V150 until *after* the officers executed both PIT maneuvers. Viewing these facts in the light most favorable to Plaintiff, a reasonable jury could conclude that Sabbe did not pose an immediate threat to the safety of the officers or the public by the time they executed the PIT maneuvers.

Each of the other *Graham* factors weighs in Plaintiff's favor. As to "severity of the crime" and "fleeing or resisting arrest," Plaintiff argues that her husband committed no crime at all by driving in his own field. The record does not conclusively establish otherwise, but Defendants maintain that they had reason to suspect that Sabbe fired a weapon unlawfully (*see* Or. Rev. Stat. § 166.220).[15] The evidence that Sabbe may have discharged his rifle was Lloyd Wetzel's call and Officer Jentzsch's radioed reports. Wetzel was unsure whether he heard a shot. Jentzsch thought he heard a shot, but he was a considerable distance away from Sabbe, and far from directing Sabbe to stop, Jentzsch was trying not to be seen. The radio traffic, CAD report, and dashcam video show that Jentzsch did not have a vantage point that allowed a clear view of what Sabbe was doing.[16] It was only after Defendants used the V150 to collide with the pickup and spin it around a second time that any of the officers perceived that Sabbe was maneuvering inside the cab of the truck to aim a weapon. These uncontested facts do not support a finding that, as of the time Defendants executed the PIT maneuvers, Sabbe had committed a serious crime or

---

[15] The dissent argues that Sabbe could not have violated this statute because his property was not within city limits, *see* Or. Rev. Stat. § 166.220, but the dissent does not support its assertion that the property was outside city limits.

[16] Jentzsch arrived at about 1:47 PM. He later testified that he originally estimated that he was about 300 yards away from Sabbe, but acknowledged he did not know the precise distance. Jentzsch testified that he saw Sabbe point a "long, black thing" toward an intersection with vehicle traffic, but he never saw Sabbe point a rifle at him. By the time the officers executed the PIT maneuvers, at approximately 3:30 PM, there is no indication that Sabbe was holding the weapon, much less pointing it at anyone.

that he was fleeing or resisting arrest.  A jury could weigh these *Graham* factors in Plaintiff's favor.

Finally, we consider that less intrusive alternatives were available short of the V150 PIT maneuvers.  We have considered less intrusive alternatives in situations in which police officers used significant force, such as shooting pepperballs at a crowd without first audibly directing the crowd to disperse.  *See Nelson*, 685 F.3d at 873, 878–79.  In *Nelson*, campus and local police officers responded to clear a gridlocked street of nearly 1,000 students and other partygoers.  *Id.* at 872–73.  Nelson was not suspected of or charged with committing a crime, and he and other students alleged they were awaiting direction from the officers.  *Id.* at 874.  The officers claimed that they had instructed Nelson and his friends to disperse, but the students did not hear any commands until after an officer fired pepperballs at the crowd, striking Nelson in the eye and seriously injuring him. *Id.*  In finding the force excessive, we reasoned that though the officers claimed to have instructed the partygoers to disperse, they "lacked any means with which to amplify their voices," and the students could not hear them.  *See id.* at 882. We held that the failure to give sufficiently audible warnings that force would be used weighed against a finding of reasonableness.  *See id.*  We also found the officers' use of force unreasonable because they used force without informing students in the gridlocked street how to comply with the direction to disperse or that force would be used against them if they did not behave in a particular manner. *Id.* at 882–83.

Here, although the V150 lacked a public address system and Sabbe had broken his cell phone the night before, Plaintiff's expert explained that officers could have made contact with Sabbe by using the hailing equipment installed

on the numerous police units that were present around the perimeter of the property, and that this would have been "a safe viable alternative" to the PIT maneuvers.  The record indicates that noise from the helicopter interfered to some extent with the officers' ability to hear each other on the radio, but a reasonable jury could decide that, after the BEAR got stuck in the mud, it was unreasonable to first use potentially deadly force instead of requesting communications equipment, waiting for it, and then attempting to communicate with Sabbe.[17]

The officers' failure to warn or provide direction to Sabbe before using potentially deadly force weighs against them.  We have repeatedly recognized that "an officer must give a warning before using deadly force 'whenever practicable.'" *Gonzalez*, 747 F.3d at 794 (quoting *Harris v. Roderick*, 126 F.3d 1189, 1201 (9th Cir. 1997) (citing *Garner*, 471 U.S. at 11–12)); *see S.R. Nehad v. Browder*, 929 F.3d 1125, 1137 (9th Cir. 2019).  Here, background noise may have made an unamplified verbal warning ineffective, but it is undisputed that the officers never communicated or made any meaningful effort to communicate with Sabbe at any time during the two-hour incident.  The "seemingly obvious principle" that, when practicable, police should give warnings before they use deadly force "is not novel" and "is

---

[17] The district court sympathized with Plaintiff's argument that less intrusive alternatives were available, but deemed the availability of alternatives irrelevant.  We have held that the availability of less intrusive alternatives is not dispositive, but we have also held that this factor is relevant to whether a use of force was reasonable.  *See, e.g.*, *Rice*, 989 F.3d at 1123–24; *Glenn v. Washington County*, 673 F.3d 864, 872 (9th Cir. 2011).

well known to law enforcement officers." *See S.R. Nehad*, 929 F.3d at 1137.[18]

### 3.

The final task under *Graham* is to balance the officers' use of force with their interest in using that force. This inquiry focuses on the facts as they existed immediately before the officers initiated the second PIT maneuver. Because a reasonable jury could decide that Sabbe did not pose an imminent threat to the officers or to others at that point, and that the balance of the other factors also favors Plaintiff, a jury could decide that the second PIT maneuver constituted the use of excessive force within the meaning of the Fourth Amendment.

### B.

We conclude that qualified immunity shields Defendants from Plaintiff's claim that the officers used excessive force when they used the V150 to collide with Sabbe's truck. "Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *White v. Pauly*, 580 U.S. 73, 78–79 (2017) (per curiam) (citation and internal quotation marks omitted). For a right to be "clearly established," it must be "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam) (internal quotation marks omitted). Although the Supreme Court "does not require a case directly on point for a right to

---

[18] In *S.R. Nehad*, we concluded the Fourth Amendment violation was contrary to law that was clearly established by April 2015. *See* 929 F.3d at 1130, 1141.

be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *Pauly*, 580 U.S. at 79 (alteration accepted) (internal quotation marks and citation omitted).

"In some circumstances, 'a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has [not] previously been held unlawful.'" *Bonivert*, 883 F.3d at 872 (alteration in original) (quoting *United States v. Lanier*, 520 U.S. 259, 271 (1997)). But even if another case articulates an applicable legal principle, qualified immunity shields the defendant from liability when the circumstances of that case are "materially distinguishable" from the one before us. *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 6 (2021) (per curiam).

We are unaware of any Supreme Court or federal court of appeals decision quantifying or characterizing the degree of force involved in using an armored vehicle to execute a low-speed PIT maneuver, let alone any precedent that would have clearly established that the officers' use of the V150 under these circumstances was unconstitutional. Defendants are not entitled to qualified immunity "simply because 'the very action in question has [not] previously been held unlawful,'" but we are still required to find that the facts of a prior case would have made it "clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *City of Tahlequah v. Bond*, 142 S. Ct. 9, 11 (2021) (per curiam) (quoting *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018)).

Plaintiff argues that Defendants are not entitled to qualified immunity for their use of the V150, citing our decisions in *Villanueva*, 986 F.3d at 1158, *Sandoval v.*

*County of San Diego*, 985 F.3d 657 (9th Cir. 2021), and *Harris v. Roderick*, 126 F.3d at 1189.  She also cites the Supreme Court's decision in *Torres*, 141 S. Ct. at 989.  None of these cases assist her cause.  With the exception of *Harris*, each of these cases was decided more than two years after the events in this case took place, so they could not have put Defendants on notice of clearly established law.   "[A] reasonable officer is not required to foresee judicial decisions that do not yet exist in instances where the requirements of the Fourth Amendment are far from obvious." *Kisela v. Hughes*, 138 S. Ct. 1148, 1154 (2018).

In *Villanueva*, we held that police officers' use of deadly force to stop a "very slowly" moving vehicle executing a three-point turn was unreasonable under clearly established law because we had held in *Orn v. City of Tacoma*,  949 F.3d 1167, 1175 (9th Cir. 2020), that an officer's use of deadly force to stop a vehicle moving toward him at five miles per hour was unreasonable.  986 F.3d at 1170–71.  The key to our holding in *Villanueva* was that the record showed the officer "could have easily stepped out of the vehicle's path." *Id.* at 1170.  In *Sandoval*, we held that nurses at a county jail violated clearly established law by failing to call paramedics or check on an inmate who was visibly suffering from a life-threatening drug overdose.  985 F.3d at 678–81.  Although we had not addressed the specific factual circumstances in that case, previous cases had found constitutional violations where custodians delayed treatment for hours when inmates were suffering from non-life-threatening conditions.  *Id.* at 680.  We reasoned that these cases were sufficient to put "every reasonable nurse" in the defendants' position on notice that it was unconstitutional to deny needed medical treatment to an inmate who "was sweating and appeared so tired and disoriented that a deputy urged that he be re-

evaluated." *Id.* In *Harris*, we held that an FBI agent violated clearly established law by shooting an armed suspect without warning, even though the suspect had engaged in a shootout with federal officers the previous day. 126 F.3d at 1202–04. We reasoned in *Harris* that *Graham* and *Garner* clearly established that officers may not use deadly force against a person who cannot reasonably be perceived to be taking any furtive or threatening actions, even if that person is armed. *Id.* at 1204. Finally, in *Torres*, the Supreme Court held that troopers had seized a suspect by shooting her, even though she subsequently and temporarily eluded capture. 141 S. Ct. at 998–99.

The circumstances underlying these cases are materially distinguishable from the circumstances presented by the confrontation between Sabbe and the officers who entered his field. Plaintiff does not show how these cases articulate a constitutional rule that applies with such obvious clarity that it should have put Defendants on notice that their use of the V150 to execute PIT maneuvers could constitute the use of deadly force, or that the use of deadly force was excessive under the circumstances presented here. Having canvassed our own case law, we are similarly unable to locate any such precedent. We had not recognized before today that the use of an armored vehicle to execute a low-speed PIT maneuver could constitute the use of deadly force. Accordingly, Defendants are entitled to qualified immunity on the claim that the V150 PIT maneuvers were unconstitutionally excessive.

The dissent would reverse the order granting qualified immunity as to Defendants' execution of low-speed V150 PIT maneuvers on the basis that taking such action was an "obvious case" where the officers should have been on notice that the PIT maneuvers could constitute the use of

excessive force, despite the lack of precedent clearly establishing that their actions would constitute a constitutional violation. The dissent relies on *Smith v. City of Hemet*, but that case concerned whether the use of pepper spray, physical assaults, and K-9 dog bites to subdue a suspect constituted excessive force. 394 F.3d at at 700-04. "[A]n officer 'cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it.'" *Kisela*, 138 S. Ct. at 1153 (quoting *Plumhoff,* 134 S. Ct. at 2023). Again, though the rule from *Kisela* does not mean a plaintiff must identify a case that is "directly on point," *Pauly*, 580 U.S. at 79 (citation omitted), we know of no case law that would obviously apply to the conduct here, particularly given the low speed of both vehicles and because the V150 struck near the left rear wheel and at the passenger side of Sabbe's pickup to spin and disable it. We do not agree that the situation presented circumstances constituting an "obvious case" within the meaning of the pertinent case law.

## III.

April Sabbe also argues the officers violated her husband's Fourth Amendment rights when they shot and killed him. In Plaintiff's view, the record does not establish that Sabbe shot or pointed a gun at the V150 such that objectively reasonable officers would believe that Sabbe posed an immediate threat to their safety. Plaintiff maintains Sabbe neither pointed nor fired a gun at the V150. Defendants say he did both.

Given the standard of review, we resolve the "who shot first" dispute in Plaintiff's favor, but whether Sabbe actually fired his rifle at the officers is immaterial to our qualified

immunity analysis. *See Long*, 511 F.3d at 906. In our circuit, "the relevant question for purposes of qualified immunity" is not whether Sabbe actually threatened the officers, but whether they "could reasonably have believed that [he] posed such a threat." *A.K.H. ex rel. Landeros v. City of Tustin*, 837 F.3d 1005, 1011 (9th Cir. 2016). "Where an officer's particular use of force is based on a mistake of fact, we ask whether a reasonable officer would have or *should* have accurately perceived that fact." *Torres v. City of Madera*, 648 F.3d 1119, 1124 (9th Cir. 2011). Thus, what matters is what reasonable officers in Corporal Edwards' and Deputy Brown's positions would have, or should have, perceived.

Our case law is clear that when a suspect reaches for a gun or aims a weapon at officers, responding with deadly force does not violate the Constitution. *See, e.g.*, *Est. of Lopez*, 871 F.3d at 1012; *Cruz v. City of Anaheim*, 765 F.3d 1076, 1078 (9th Cir. 2014). When a suspect "is armed—or reasonably suspected of being armed," even "a furtive movement" can "create an immediate threat" sufficient to justify the use of deadly force. *George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013).

Here, the record is consistent and establishes that it was reasonable for Edwards and Brown to perceive Sabbe as an immediate threat.[19] It is not disputed that officers had received multiple reports that Sabbe might be armed and

---

[19] The dissent argues that it is "premature" to grant qualified immunity because the reasonableness of the officers' perception depends on the jury's "resolution of disputed facts and the inferences it draws therefrom." *Santos v. Gates*, 287 F.3d 846, 855 n.12 (9th Cir. 2002), *overruled on other grounds by Pearson*, 555 U.S. at 2233. We are unpersuaded that there are any such material disputes of fact.

intoxicated, and that he had been behaving erratically and in a hostile manner.  Sergeant Braun—who was driving the V150—testified that just before the shooting, he perceived that Sabbe had intentionally rammed his pickup into the V150.  Corporal Edwards, who was also in the V150, testified that he leaned out of the vehicle and saw Sabbe with a rifle that was not yet pointed at the V150; he shot at Sabbe when he saw him attempting to aim the rifle.  When asked whether he heard anything before he decided to shoot, Edwards testified that he heard a shot, which he knew was not from Brown because Brown had not yet emerged from the V150's upper hatch, and that he also heard Braun say that Sabbe was shooting or aiming at the V150.

Deputy Brown recalled that Sabbe fired a shot, and that he saw Sabbe pointing a rifle directly at the V150 when he emerged from the upper hatch; both occurred before he fired at Sabbe.  Brown also heard Braun's exclamation, and although he was not sure of Braun's exact words, he recalled "something of the nature of 'he has a rifle he's pointing at us.'"  From his vantage point of driving the V150, Braun's first impression was seeing glass exploding out at him, followed by the sound of gunfire from his companions.  He testified that he did not think it was possible to see actual gunfire unless tracer rounds were used, but explained that "the evidence of the gunfire coming from [the truck] was the glass exploding out, away from the vehicle."  The dissent finds it "important" that Braun did not testify at his deposition that he told the others that Sabbe was shooting or pointing a rifle at the V150, but it appears that Braun was not asked that question.

The dissent contends that "[s]ummary judgment is not appropriate in § 1983 deadly force cases that turn on the officer's credibility that is genuinely in doubt." *Newmaker*

*v. City of Fortuna,* 842 F.3d 1108, 1116 (9th Cir. 2016); *see also Gonzalez*, 747 F.3d at 795. To be sure, we must carefully examine "all the evidence in the record" in fatality shooting cases to determine whether an "officer's story is internally consistent and consistent with other known facts." *Gonzalez*, 747 F.3d at 795 (citation omitted). But this case stands in sharp contrast to the facts in *Newmaker* and *Gonzalez*. In *Newmaker*, the officers' version of events— which plainly changed over time— was contradicted by an autopsy report and video evidence. 842 F.3d at 1116. In *Gonzalez*, we could not "simply dismiss the internal contradictions" in the officers' testimony that rendered their asserted "combination of facts . . . physically impossible." 747 F.3d at 794–95. The record does not support the dissent's assertion that Corporal Edwards "changed his story." Edwards was asked to describe how he was positioned before he fired. In response to a follow-on question specifically asking whether he heard anything before he decided to fire his weapon, Edwards provided additional testimony that was entirely consistent with his previous answer describing how his arms were positioned when he fired his weapon.

In arriving at our conclusion, we are also mindful that our law "embod[ies] allowance for the fact that police officers are often forced to make split-second judgments— in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97. On the facts of this case, the district court correctly ruled that the officers were entitled to qualified immunity for shooting and killing Remi Sabbe.

### IV.

Finally, Sabbe brings a *Monell* claim against the County for its failure to train officers on the use of the V150. *Monell* established that municipalities can be liable under § 1983 for constitutional violations because of: (1) official policies; (2) pervasive practices or customs; (3) failures to train, supervise, or discipline; or (4) decisions or acts by policymakers. 436 U.S. at 690–95; *Horton ex rel. Horton v. City of Santa Maria*, 915 F.3d 592, 602–03 (9th Cir. 2019). Qualified immunity does not apply to *Monell* claims. *Horton*, 915 F.3d at 603. But *Monell* requires that plaintiffs show the need "for more or different action is so obvious, and the inadequacy of existing practice so likely to result in the violation of constitutional rights, that the policymakers of the [county] can reasonably be said to have been deliberately indifferent to the need." *Hyun Ju Park v. City & County of Honolulu*, 952 F.3d 1136, 1141 (9th Cir. 2020) (internal quotation marks, citation, and alteration omitted). Here, Sergeant Braun testified as the County's deposition designee that he had never heard of using an armored vehicle to execute a PIT maneuver and it was "not something we ever thought of" and thus "not something we've ever addressed under policy." Though a jury could decide that the second PIT maneuver constituted deadly force, the record does not give rise to a genuine dispute that the County's failure to establish guidelines for using the V150 to execute PIT maneuvers rose to the level of deliberate indifference.

### CONCLUSION

For the above reasons, we **AFFIRM** the district court's order granting Defendants' motion for summary judgment.

BERZON, Circuit Judge, concurring in part and dissenting in part:

On a Friday afternoon in rural Oregon, a neighbor's 911 call reporting that Remi Sabbe was driving a pick-up truck erratically, possibly with a gun, on his own property, triggered a tragic chain of events.[1] The county police department deployed roughly thirty police officers and two armored vehicles to the scene, including an armored tank on loan from the FBI. Despite nearly two hours of observation, during which time Sabbe's truck remained stationary and in sight, no officer attempted to communicate with Sabbe. Then, when the truck began to move, Defendants drove the armored tank onto the property without warning or explanation.[2] In an unprecedented Pursuit Intervention Technique ("PIT") maneuver by an armored vehicle, the tank intentionally rammed the truck twice. By the end of the confrontation, Sabbe had been shot eighteen times. He died at the scene.

This lawsuit is a case study in disproportionate law enforcement response. I concur in Parts II.A and Part IV of the majority opinion, and in Part III insofar as it holds that the Defendants are not entitled to summary judgment as to whether Sabbe shot at the officers in the armored vehicle before they shot at him. I dissent from the majority's refusal

---

[1] As the majority recognizes, Remi Sabbe and his brother Kevin were the primary caretakers of the land, which was owned by the Sabbe family. Majority Op. at 6. I follow the majority's lead in referring to Remi as an owner of the property.

[2] I adopt the majority's usage of the term "Defendants" to refer to the individual officer defendants named in this case. I note that the named defendants also include the Washington County Board of Commissioners, a state entity.

to hold Defendants accountable for their clearly unlawful warrantless entry onto Sabbe's property and the excessive uses of force that ultimately resulted in Sabbe's death.

The majority's recitation of the disturbing set of events is for the most part complete and accurate. I recount the pertinent underlying facts in discussing the various claims at issue, expressing disagreement in a few instances with the majority's characterization of the record.

## I.

For reasons that will become clear, I begin with the excessive force claim based on the fatal shooting. I disagree with the majority's conclusion that the officers are entitled to qualified immunity as to the fatal shooting. Furthermore, I conclude that there is a disputed issue of material fact as to whether the officers reasonably perceived Sabbe to pose an immediate threat. That conclusion is relevant to whether the officers' unlawful entry was the proximate cause of Sabbe's death, addressed in Part II of this partial dissent.

"An officer's use of deadly force is reasonable only if the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *Gonzalez v. City of Anaheim*, 747 F.3d 789, 793 (9th Cir. 2014) (en banc) (internal quotation marks and citations omitted); *see also Thomas v. Dillard*, 818 F.3d 864, 889 (9th Cir. 2016) (describing the existence of "an immediate threat to the safety of the officers or others" as "[t]he most important factor" in determining whether officers' use of force is "objectively reasonable"). A shooting is undoubtedly a use of deadly force. Thus, the "relevant question for purposes of qualified immunity" is whether Defendants "could reasonably have believed that [Sabbe] posed such a threat." *A. K. H. by & through*

*Landeros v. City of Tustin*, 837 F.3d 1005, 1011 (9th Cir. 2016).

The officers' shooting occurred moments after the conclusion of the second PIT maneuver. The majority acknowledges that the "uncontested facts do not support a finding that, as of the time Defendants executed the PIT maneuvers, Sabbe had committed a serious crime or that he was fleeing or resisting arrest." Majority Op. at 29–30. In fact, at the time of the last PIT maneuver, "Sabbe had come to a complete stop." Majority Op. at 25. And at no point during the PIT maneuvers had the officers attempted to communicate with Sabbe, so he was not disobeying orders or resisting arrest.

Thus, whether Sabbe pointed a rifle or shot at the officers before they opened fire is central to our inquiry. If Sabbe did not point or shoot a rifle at the officers and was not perceived to have done so, no reasonable officer would have believed the use of deadly force was permissible. There would have been no reason to escalate the use of force from a PIT maneuver (itself the use of excessive force, as the majority recognizes, Majority Op. at 32) to the firing of guns.

The majority recognizes that the facts are disputed as to this critical question, and concludes that, as this is an appeal from an award of summary judgment to the Defendants, "we resolve the 'who shot first' dispute in the Plaintiff's favor." Majority Op. at 36. In other words, for the purposes of the present inquiry, Sabbe did not point his rifle or shoot at the officers. But the majority also asserts that this factual dispute is "immaterial to our qualified immunity analysis," because the officers' mistaken perception that Sabbe pointed a rifle and shot at them was reasonable, thus justifying their use of force. *Id.*

In so holding, the majority fails to recognize that the *only* evidence to support Defendants' assertions about why this perception was reasonable is the officers' own testimony.[3] So the factual dispute as to what the officers actually heard and saw is critical to the question whether they made a reasonable mistake. Granting qualified immunity is "premature" where the reasonableness of an officer's mistake "depend[s] on the jury's resolution of disputed facts and the inferences it draws therefrom." *Santos*, 287 F.3d at 855 n.12, *overruled on other grounds by Pearson v. Callahan,* 555 U.S. 223 (2009); *see also, e.g.*, *Demuth v. County of Los Angeles*, 798 F.3d 837, 839 (9th Cir. 2015); *Lacey v. Maricopa County*, 693 F.3d 896, 921 n.15 (9th Cir. 2012).

The majority concludes that it was reasonable for Edwards and Brown to have perceived Sabbe as an immediate threat because they heard Braun say that Sabbe was aiming or shooting at the V150. Majority Op. at 37–38. But the officers' testimony in the record is inconclusive about whether Braun actually said that, and, if so, whether he said that before or after the officers shot Sabbe.

Only Corporal Edwards testified that he heard Braun say, "he's shooting at us." And Edwards' testimony was internally contradictory as to this and other matters. Edwards first asserted that he "leaned out [of the V150] to see what I could see[,] . . . observed Mr. Sabbe maneuvering his rifle to point out the passenger side of the car," and "fired one round" because Sabbe "was trying to point his rifle at us." The attorney examining Edwards then asked, "before you decided to do that, did anybody yell anything or did you hear

---

[3] The video footage of the incident was filmed from too great a distance to shed any light on the issue.

anything from inside or outside of the V-150?" And Edwards changed his story. He testified that "*before* I leaned out, Corporal Braun told us 'He's pointing a rifle at us.'" Edwards then stated he "heard a gunshot that I knew wasn't mine or Deputy Brown's . . . [that] sounded like it came from outside the V-150," and "Corporal Braun confirmed that '[h]e's shooting at us.'" Edwards next averred that only then did he lean out of the V150 and fire one round. Edwards, the only witness to testify he heard Braun say that Sabbe was shooting at the officers, at first testified that he "leaned out to see what I could see," but then said that he leaned out and shot because he heard gunshots and heard Captain Braun say that Sabbe was shooting at the officers. A jury could conclude that if the second version were correct, Edwards would not have given the earlier, benign account about why he leaned out of the V150—"to see what I could see"—and that the two versions were inconsistent.

An examination of the testimony of the other officers in the V150 reveals further inconsistencies. Deputy Brown testified that he heard Braun say, "he is pointing a rifle at us," as Brown was getting out of the turret of the tank. Brown also stated that, after "I came out of the turret, I saw the back rear passenger window break" and "I also saw [Sabbe] pointing the rifle at—at us." Yet Braun never testified that he saw Sabbe with a rifle. He testified that "*my first impression* was that the glass [of Sabbe's truck window] exploded out towards me, and then I heard the gunfire that turned out was probably my coworkers firing back." Importantly, Braun did not testify that he made any statements to Edwards or Brown about whether Sabbe was pointing a rifle or shooting at the officers.

In cases such as this, "where the only witness other than the officers was killed during the encounter," we must

carefully examine all the evidence in the record to "ensure that the officer is not taking advantage of the fact that the witness most likely to contradict his story—the person shot dead—is unable to testify." *Gonzalez*, 747 F.3d at 795 (internal quotation marks and citation omitted). A jury could reasonably conclude that the officers' contradictory testimony was insufficient to support a finding that Corporal Braun actually told the other officers that Sabbe was pointing or firing a rifle at the officers. If so, nothing else in the record supports a finding that the officers reasonably could have believed that Sabbe pointed or shot a rifle at them, or that Sabbe otherwise posed an immediate threat of death or serious harm.

Granting qualified immunity through "[s]ummary judgment is not appropriate in § 1983 deadly force cases that turn on the officer's credibility that is genuinely in doubt." *Newmaker v. City of Fortuna,* 842 F.3d 1108, 1116 (9th Cir. 2016). Viewing the evidence in the light most favorable to Sabbe, Sabbe did not point a rifle or shoot at the officers, nor did the officers reasonably believe that he did. Under those circumstances, I would hold that Defendants were not entitled to summary judgment as to whether the fatal shooting of Sabbe was excessive force in violation of the Fourth Amendment, or whether they are entitled to qualified immunity.

## II.

The majority disposes of the unlawful entry claim without assessing its merits by concluding that, even if the entry violated the Fourth Amendment, it was not the proximate cause of Remi Sabbe's death. Majority Op. at 14. Specifically, the majority concludes that there is no genuine dispute about whether the officers reasonably perceived that

Sabbe pointed a rifle or shot at them before they opened fire, and—in something of a non sequitur, given the holding that for purposes of this appeal we assume that Sabbe did not fire the first shot—that Sabbe's act was a superseding cause of his death. *Id*. I would hold that Defendants' entry onto Sabbe's property was a clearly established violation of the Fourth Amendment, as to which Defendants are not entitled to qualified immunity. I would also hold that there was no superseding cause with respect to liability for Sabbe's death as a result of the illegal entry because, as just discussed, whether the officers reasonably perceived Sabbe to have shot or pointed a rifle at them is disputed.

Further, even assuming that the officers' perceptions that most immediately led to the shooting *were* reasonable, a reasonable perception is not a superseding cause. A causal link for section 1983 purposes is broken only by something that actually happened, not by an event that did not happen but was reasonably perceived to have occurred. *See Mendez v. County of Los Angeles*, 897 F.3d 1067, 1081 (9th Cir. 2018). Moreover, it was eminently foreseeable that the entry of an unmarked, armored tank onto the property, without any prior attempts to communicate with Sabbe, and no attempt to do so once on the property, would lead to the use of deadly force resulting in Sabbe's death.

## A.

It is a "basic principle of Fourth Amendment law" that warrantless searches of the home or the curtilage surrounding the home are "presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586 (1980). Defendants do not dispute that the entry onto Sabbe's property constituted a Fourth Amendment search without warrant or

consent.[4] Instead, Defendants argue that either the exigency or the emergency exception to the warrant requirement applied because, at the time of entry, the officers suspected that Sabbe had committed the crime of unlawful use of a weapon, and because they perceived his movement as a threat to the officers positioned at the perimeter of the property and to the general public. Defendants assert that they entered only after Sabbe's truck began to move to "contain Sabbe on the property."

The exigency and emergency exceptions are "narrow," and their boundaries are "rigorously guarded." *United States v. Stafford*, 416 F.3d 1068, 1073 (9th Cir. 2005). The exigency exception is based on the "officers' investigatory

---

[4] The district court noted that "[i]t is quite possible that the field Sabbe drove on is more appropriately characterized as 'open fields' rather than 'curtilage,'" but concluded that "the record on this question is insufficient." Much of the Sabbes' large property is open field or wooded forest, but it also contains the Sabbes' childhood home, a barn, a granary, and a shed. It is undisputed that the V150 entered Sabbe's property through "a driveway that led up to [the] house." Evidence in the record indicates that the entrance to the driveway was blocked with a chain and marked with "no trespassing" signs, although Sergeant Braun, who drove the V150, later testified that he did not see any signs.

In defining the extent of curtilage, courts look to "the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by." *United States v. Dunn*, 480 U.S. 294, 301 (1987). "[T]he curtilage of a home in a rural area could extend farther than the curtilage of a home in an urban or suburban setting." *United States v. Johnson*, 256 F.3d 895, 902 (9th Cir. 2001). The record indicates there is at least a factual dispute as to whether the driveway constitutes curtilage. Viewing the facts in the light most favorable to Sabbe at summary judgment, I assume that the driveway is curtilage to which the Fourth Amendment applies.

function," allowing them to make a warrantless entry if they have (1) "probable cause to believe that a crime has been or is being committed," and (2) "reasonable belief that their entry is 'necessary to prevent . . . the destruction of relevant evidence, the escape of the suspect, or some other consequence improperly frustrating legitimate law enforcement efforts.'" *Hopkins v. Bonvicino*, 573 F.3d 752, 763 (9th Cir. 2009) (quoting *United States v. McConney*, 728 F.2d 1195, 1199 (9th Cir. 1984) (en banc)). The emergency exception "derive[s] from police officers' community caretaking function," *Espinosa v. City & County of San Francisco*, 598 F.3d 528, 534 (9th Cir. 2010), and permits them to make a warrantless entry if they have an "objectively reasonable basis for concluding that there is an immediate need to protect others or themselves from serious harm." *United States v. Snipe*, 515 F.3d 947, 952 (9th Cir. 2008). Neither the exigency nor the emergency exception justified Defendants' intrusion on Sabbe's property.

(i)

(a)

The exigency exception does not apply, first, because the officers had no probable cause to believe that Sabbe had or was in the process of committing a crime. *See Hopkins*, 573 F.3d at 763. Defendants do not seriously argue that they did. Instead, their brief on appeal asserts only that they "*suspected* Sabbe had committed the crime of Unlawful Use of a Weapon." *See* Or. Rev. Stat. § 166.220. And Sergeant Braun testified that he "had reasonable suspicion to talk to him about potential crimes," not that there was probable cause that any crime had been committed. The record demonstrates that the claimed suspicion was unsupported. And in any case, "mere suspicion" or "even strong reason to

suspect are not enough" to establish probable cause. *United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007) (cleaned up) (quoting *McKenzie v. Lamb*, 738 F.2d 1005, 1008 (9th Cir. 1984)).

During the two hours that passed between Lloyd Wetzel's initial 911 call at 1:33 PM and Defendants' entry at 3:29 PM, the officers knew that a few shots had been heard in the area of Sabbe's property and that Sabbe possibly had a gun. Between 1:47 and 1:54 PM, Wetzel and Officer Jentzsch, the first officer to respond to Wetzel's 911 call, reported hearing "a couple shots." But neither could attribute the shots to Sabbe, nor did they see in which direction the shots had been fired. After "trying to get as far away as [he could]" from the scene, Jentzsch, who testified that at that point he was approximately 300 yards away from Sabbe, reported to dispatch that it "looked like he was holding a rifle [and] pointing it towards the [intersection]."[5] That is the extent of any officer's observation of conduct potentially related to the use of a weapon. At 2:05 PM, Jentzsch relayed that he had lost sight of Sabbe. The officers remained unaware of Sabbe's location until 3:23 PM, when they realized that Sabbe was inside his truck, which had remained stationary and in sight during the officers' monitoring of the property.[6]

In the meantime, the officers had acquired information that substantially undermined any suspicion they may have

---

[5] Jentzsch later testified at his deposition that he saw Sabbe "holding something long and black in between both of his hands." The implication is that Sabbe was just holding, not pointing, whatever he had in his hands.

[6] At 2:33 PM, an officer had reported to dispatch, "We have eyes on the truck. It looks like it is running, but we can't really see inside."

had that Sabbe was committing or had committed the crime of unlawful use of a weapon. By 3 PM, nearly thirty minutes before Defendants' unlawful entry, officers had established contact with April Sabbe, the registered owner of the truck, who told them the suspect was likely her husband Remi, and that he was an owner of the property."[7] As Sergeant Braun, the driver of the tank, recognized in his deposition, Sabbe had the right to possess and discharge a firearm on his own property.[8] Oregon allows the possession of firearms within a person's residence or place of business without permit or license, and generally permits shooting on private property that is not "within city limits." *See* Or. Rev. Stat. § 166.250(2)(b); *id.* § 166.220(1). The Sabbe property was not within those limits.[9] Under those circumstances, the crime of unlawful use of a weapon applies only if there is an "attempt[]" or "intent to use [the weapon] unlawfully against

---

[7] The audio recording of the radio traffic shows that Lieutenant Lotman relayed the contents of the conversation with April Sabbe to the dispatch as follows: the suspect in the truck was "probably [April's] husband Remi"; he was "associated with this property," which had been the subject of recent burglaries; and that he had been "recently drinking, doesn't like police, history of elude [sic] and went down there to protect his property."

[8] Braun testified that he knew of a property dispute between Remi and his brother over how the property was being leased or controlled, but that he didn't know "where that information [came] from." He agreed that if Sabbe owned and was not leasing the property, then he had the right to possess and discharge a firearm there.

[9] Kevin Sabbe, Remi's brother, testified in his deposition that the family used to hunt regularly on the property as well as on Wetzel's neighboring property.

another." Or. Rev. Stat. § 166.220(1)(a).[10] There was no evidence that Sabbe shot at or aimed at anyone.

In other words, even if Sabbe *did* possess a rifle and *had* used it on his property earlier that day, that use would not, without more, have been unlawful. There was no indication from any officer's observation before the entry onto the Sabbe property that Sabbe had attempted or intended to use a weapon against another person, on the property or off. Nor was it likely that he could have shot at or aimed at anyone on the property; April Sabbe had informed the officers that the property was supposed to be vacant. Braun acknowledged that, if Sabbe had "walked out to us and said howdy and explained who he was, we'd all get in our vehicles and turn around and drive away"; Jentzsch said essentially the same thing regarding his earlier encounter.

Viewing the record in the light most favorable to the plaintiff, *Peck v. Montoya*, 51 F.4th 877, 887 (9th Cir. 2022), the only possibility that Sabbe was committing a crime was

---

[10] Oregon law states that "[a] person commits the crime of unlawful use of a weapon if the person:

  (a) Attempts to use unlawfully against another, or carries or possesses with intent to use unlawfully against another, any dangerous or deadly weapon . . . or

  (b) Intentionally discharges a firearm, blowgun, bow and arrow, crossbow or explosive device within the city limits of any city or within residential areas within urban growth boundaries at or in the direction of any person, building, structure or vehicle within the range of the weapon without having legal authority for such discharge."

Or. Rev. Stat. § 166.220(1).

if he was attempting or intending to use the weapon unlawfully against someone else. Or. Rev. Stat. § 166.220(1)(a). There was no probable cause that he was. At best, he "might" have had a gun pointed at a roadway, not a person, and that assertion was based on observing from 300 yards away that he was holding something long and black in his hands. There is no doubt that defendants lacked probable cause to conclude that Sabbe had committed any crime.

(b)

In any case, "[e]ven if the officers had probable cause . . . more is required to justify a warrantless entry" under the exigency exception. *Hopkins*, 573 F.3d at 768 (emphasis omitted). "No amount of probable cause can justify a warrantless search or seizure absent 'exigent circumstances.'" *United States v. Johnson*, 256 F.3d 895, 907 (9th Cir. 2001) (per curiam) (en banc) (internal quotation marks, alteration, and citation omitted). Defendants have not elicited "specific and articulable facts to justify the finding" of any exigency here. *Sandoval v. Las Vegas Metro. Police Dep't*, 756 F.3d 1154, 1161 (9th Cir. 2014) (quoting *LaLonde v. Cnty. of Riverside*, 204 F.3d 947, 957 (9th Cir. 2000)).

Exigent circumstances encompass situations that are "few in number and carefully delineated," in which "the exigencies of the situation make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." *United States v. Struckman*, 603 F.3d 731, 743 (9th Cir. 2010) (internal quotation marks and citations omitted). Such circumstances are those "that would cause a reasonable person to believe that entry . . . was necessary to prevent physical harm to the officers or other persons, the destruction

of relevant evidence, the escape of the suspect, or some other consequence improperly frustrating legitimate law enforcement efforts." *United States v. McConney*, 728 F.2d 1195, 1199 (9th Cir. 1984) (en banc), *overruled on other grounds by Est. of Merchant v. Comm'r*, 947 F.2d 1390, 1392–93 (9th Cir. 1991).

Defendants argue that exigent circumstances existed because "[t]hey perceived Sabbe's movement as a threat to the officers positioned at the perimeter of the property, and a threat to the general public if Sabbe should enter a public roadway." Their warrantless entry was necessary, defendants assert, to "contain Sabbe on the property."

The evidentiary record provides no basis for any such perception. A few minutes after the officers discovered that Sabbe was inside the truck at 3:23 PM, an officer reported to dispatch that Sabbe was "moving inside the cab," and then that the truck began "moving westbound."[11] But the fact that Sabbe began to drive on his own property doesn't establish an objectively reasonable basis for concluding that warrantless entry was necessary to prevent physical harm to the officers or others.

First, no evidence suggests that Sabbe intended to leave his property or approach the officers stationed at its perimeter. As the majority notes, earlier in the day, at 1:33 PM, "Sabbe was reported to be driving erratically and

---

[11] April Sabbe argues that it is disputed whether Defendants entered the property after Sabbe's truck moved or after they learned Sabbe was moving *inside* his truck. The Computer Aided Dispatch ("CAD") report of the radio traffic records only an officer stating "subj moving inside truck" before Defendants enter the property. However, the more comprehensive audio recording of the radio traffic indicates that an officer reported seeing Sabbe's truck move before Defendants' entry.

tearing up the muddy field, *but he was on his own property*."
Majority Op. at 28 (emphasis added). And the officer who
radioed at 3:27 PM, that Sabbe's truck began "moving
westbound" did not report that Sabbe was heading towards
the property perimeter or a public roadway, nor does any
other evidence in the record so indicate.[12] During the nearly
two hours that officers observed the property before
Defendants' entry, Sabbe had never tried to leave. In fact,
Sabbe's initial reaction upon seeing Officer Jentzsch's
marked police car near his property was "to reverse the truck
and *retreat* into his own field." Majority Op. at 28 (emphasis
in original). Moreover, the officers knew that Sabbe was
there to "protect his property" after it had suffered a series
of recent burglaries; with that motivation why would Sabbe
want to leave his property unattended?

Second, there is no evidence that, if Sabbe did leave his
property, doing so would have presented an immediate threat
to officers or the general public and so justify Defendants'
entry within a minute of Sabbe's movements. As one officer
reported to dispatch after speaking with April Sabbe, "we
have no information that he's looking to harm anyone."
Although the officers were told before they arrived that shots
had been heard and that Sabbe might have a gun, no further
gunfire had been heard in the intervening hour and a half.
There is also no indication that, when Sabbe's truck began
to move at 3:27 PM, Sabbe was holding a weapon, much less
pointing it at anyone or toward a public roadway.

---

[12] Evidence in the record indicates that the driveway, where the V150
was stationed, was the only means of entry or exit from the Sabbe
property. According to Braun, a "huge ditch" prevented access to most
of Sabbe's property.

Moreover, by the time of Defendants' entry, actions had been taken to reduce significantly any risk of danger to the public or to the surrounding officers. At least thirty police units had arrived on the scene. Civilian traffic around the property had been largely shut down.[13] Defendants do not explain why, in light of these measures, a warrantless entry onto Sabbe's property was necessary to address whatever threat Sabbe might have posed, especially without attempting any other type of intervention first. Most notably: According to Defendants, the officers' goal was communication. Yet no attempt at communication with Sabbe—by bullhorn, loudspeaker, or otherwise—was ever made.

Defendants do not assert that Sabbe's potential movement off the property would have constituted any other type of exigent circumstance, such as the escape of the "suspect." Nor could they. First, there was no probable cause to arrest Sabbe, and so no basis for concern that he might escape. Second, there is no suggestion in the record that the thirty police units surrounding the Sabbe property would be unable to capture Sabbe if he attempted to escape off the property.

---

[13] The majority represents that "traffic continued to pass by on the road abutting the edge of the property" at the time the PIT maneuver was executed. Majority Op. at 27. According to the radio traffic, Officer Cooper reported at around 3:23 PM that there was still a steady flow of traffic and requested that it be shut down. In discussing the decision to enter the property with the V150, Sergeant Bowman testified that, shortly after that call, "we were able to adjust and get that shut down, too." Bowman stated that they were eventually successful in shutting down all the roads around the property, apparently before the PIT maneuver occurred.

In sum, Defendants lacked both probable cause and exigent circumstances. The exigency exception cannot justify Defendants' warrantless entry onto the Sabbe property.

(ii)

Defendants' assertion of the emergency exception rests upon similar grounds to their assertion of the exigency exception and fails for similar reasons. Pursuant to the emergency exception, "law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). There must be "an objectively reasonable basis for concluding that there is an immediate need to protect others or themselves from serious harm." *Hopkins*, 573 F.3d at 764 (emphasis omitted) (quoting *Snipe*, 515 F.3d at 951–52).

The Defendants had no basis to believe that there was anyone on the property other than Sabbe, nor any ground for fearing that he had been or was about to be injured.[14] Rather, like their position regarding the exigency exception, Defendants' argument concerning the emergency exception rests on the notion that Sabbe might *leave* the property and pose a threat to officers and the general public. The emergency exception permits warrantless entry upon the premises when officers "reasonably believe that a person *within* is in need of immediate aid." *Mincey v. Arizona*, 437 U.S. 385, 393 (1978) (emphasis added); *see also Michigan*

---

[14] April Sabbe had informed at least some of the officers that Sabbe was likely alone, and various officers radioed that the property should be vacant. Although earlier in the day Jentsch reported that Sabbe had "crashed into a tree," he also described Sabbe "getting out on foot" and stated that no medical support was needed.

*v. Fisher*, 558 U.S. 45, 47–48 (2009). Allowing warrantless entry to prevent potential harm *off*-premises would stretch the "narrow" and "rigorously guarded" boundaries of the exception, creating a vast gap in the warrant requirement applicable to entry into homes for all circumstances in which a suspect is feared to be dangerous to the public *outside* the home. *Hopkins v. Bonvicino*, 573 F.3d 752, 763 (9th Cir. 2009) (quoting *United States v. Stafford*, 416 F.3d 1068, 1073 (9th Cir. 2005)). The case law sanctions no such fissure in "the ancient adage that a man's house is his castle." *Georgia v. Randolph*, 547 U.S. 103, 115 (2006) (quoting *Miller v. United States*, 357 U.S. 301, 307 (1958)).

In any event, the evidence in the record does not provide any basis to believe that Sabbe was preparing to leave the property; that if he did, there was a reasonable basis to fear he would have attacked any of the thirty officers surrounding the property; or that that horde of law enforcement officers could not have dealt with the danger as well off the private property as on. Yet, a minute after Sabbe's truck began to move, officers entered his property without a warrant, in two armored vehicles.[15] No emergency justified Defendants' unlawful, warrantless entry onto Sabbe's property.

(iii)

Having concluded that Defendants' warrantless entry violated Sabbe's Fourth Amendment right, I would also conclude that Defendants are not entitled to qualified immunity, because that right was clearly established at the time of the violation. *See Peck v. Montoya*, 51 F.4th 877, 887

---

[15] One of the armored vehicles, an armored SWAT truck, called the BEAR, got stuck in the mud just after entering the field, and was not further deployed. Unlike the V150, the BEAR had police markings and was equipped with a public address system.

(9th Cir. 2022). "Among constitutional rules, few are as well established, frequently applied, and familiar to police officers as the warrant requirement and its exceptions." *Bonivert v. City of Clarkston*, 883 F.3d 865, 873 (9th Cir. 2018).

There is no shortage of case law establishing that, to rely on the exigency exception, the government must prove that officers had probable cause to believe that a crime has been or is being committed. *See, e.g.*, *Sandoval v. Las Vegas Metro. Police Dep't*, 756 F.3d 1154, 1161 (9th Cir. 2014); *Hopkins*, 573 F.3d at 766–67; *Johnson*, 256 F.3d at 905. Yet, Defendants do not seriously argue that they had probable cause; they assert only that officers "suspected" Sabbe had committed a crime, but point to no explanation or evidence to support that suspicion. *See supra* Part II.A.i.a.

Similarly, the officers were on notice that the emergency exception only applies if there is an objectively reasonable basis for concluding there exists an immediate need to protect themselves or others from serious harm on the property. *See, e.g.*, *Ames v. King Cnty.*, 846 F.3d 340, 350–52 (9th Cir. 2017) (vehicle occupant overdosed in a suicide attempt); *Snipe*, 515 F.3d at 952–53 (emergency call by a "hysterical" caller screaming "[g]et the police over here now"); *Brigham City*, 547 U.S. at 403–07 (officers witnessed ongoing violence within the home). The facts of this case present a stark contrast to the emergency situations discussed in the established case law. *See Hopkins*, 573 F.3d at 766 (collecting cases). The record contains no evidence that Sabbe himself was in need of medical attention, or that he was endangering anyone on the property. No reasonable officer could have believed the circumstances of this case justified application of the emergency exception.

B.

The majority sidesteps any acknowledgment of this egregious breach of the Fourth Amendment by asserting that, even if Defendants' warrantless entry was unlawful, it was not the proximate cause of Sabbe's death.

As an initial matter, whether Sabbe's death was proximately caused by the warrantless entry is relevant to the question of damages, not liability. For purposes of section 1983 liability, the relevant question is whether the defendants' actions caused a deprivation of Sabbe's constitutional rights, not whether they caused his death. *Arnold v. Int'l Bus. Machines Corp.*, 637 F.2d 1350, 1355 (9th Cir. 1981). And here the right at issue is the right to be free from unlawful entry.[16]

Furthermore, "a plaintiff in a civil rights action under section 1983 is entitled to nominal damages as a matter of law if she obtains a favorable jury verdict." *Floyd v. Laws*, 929 F.2d 1390, 1401 (9th Cir. 1991) (citing *Carey v. Piphus*, 435 U.S. 247 (1978)). *See also George v. City of Long Beach*, 973 F.2d 706, 708 (9th Cir. 1992) (holding that the plaintiff was entitled to judgment and nominal damages on his section 1983 claim where the court concluded that an officer's warrantless entry violated the Fourth Amendment,

---

[16] The majority opinion states that "April Sabbe premises her warrantless entry claim—like all three of her Fourth Amendment claims—exclusively on Remi Sabbe's death." Majority Op. at 15. But the plaintiff's opening brief argues that a reasonable jury could find three separate constitutional violations occurred, including that the officers "illegally entered Sabbe's property without permission, a warrant, or exigency, in violation of the Fourth Amendment." And while the reply brief responds to the defendants' no-proximate cause argument, it does not suggest that liability for the unconstitutional entry depends on causation being established.

even though the plaintiff's injuries were not caused by the illegal entry). A district court errs when it dismisses a section 1983 damages claim for lack of actual damages if there was a deprivation of a constitutional right. *Draper v. Coombs*, 792 F.2d 915, 921–22 (9th Cir. 1986).

In any event, I disagree with the majority as to whether the armored vehicle's unconstitutional entry on the property was a proximate cause of Sabbe's death. The majority reasons that because the officers reasonably perceived that Sabbe pointed a rifle and shot at them once the armored vehicle was on the property, this "was surely a superseding cause" of the fatal shooting of Sabbe. Majority Op. at 16. As I explained earlier, *see supra* Part I, I would hold that the Defendants were not entitled to summary judgment as to whether their perceptions about Sabbe's actions were reasonable. I would therefore hold that no superseding cause was established for summary judgment purposes.

But even accepting the majority's conclusion that the officers' perceptions were established on summary judgment to be reasonable, there was still no superseding cause. True, an *actual* intentional attempt by an individual to harm law enforcement officers can sever the causal chain between a constitutional violation and the victim's injury. *See, e.g.*, *Bodine v. Warwick*, 72 F.3d 393, 400 (3d Cir. 1995). But the majority acknowledges, and I agree, that whether Sabbe did point a rifle or shoot first is disputed, so we assume for purposes of the summary judgment appeal that he did not. *See* Majority Op. at 36.

If he did not, there could be no superseding cause, whatever the officers thought, reasonably or otherwise. "A superseding or intervening cause involves a shifting of responsibility away from a party who would otherwise have

been responsible for the harm that occurs." *Mendez*, 897 F.3d at 1081 (citing W. Page Keeton et al., Prosser and Keeton on Torts § 44 (5th ed. 1984)). That shifting of responsibility ordinarily requires an intentional act. Where there is no such act—as the majority assumed here, viewing the facts most favorable to Sabbe—the misperception, reasonable or otherwise, that there was such an act is not a basis for shifting the blame to the victim because of something (we are assuming) he did not do. *Id.* Further, "an officer has a duty not to enter in part because he or she might misperceive a victim's innocent acts as a threat and respond with deadly force." *Id.*

The principle that the misperception of innocent acts does not break the causal chain has particular application where the officers create the conditions under which those actions are likely to be misperceived as threatening. In *Mendez*, for example, officers entered the shack where the Mendezes resided without a warrant, unannounced, and with weapons drawn. *Id.* at 1072. "The officers were on alert, believing themselves to be searching for an armed individual." *Id.* at 1078. Moments later, the officers shot both occupants after Angel Mendez moved a BB gun from the futon where he had been sleeping to the floor. *Id.* at 1081. The court reasoned that Mendez's action in moving the gun was not a superseding cause of the shooting because it was foreseeable that the officers' mode of entry could lead them to mistake an innocent act as a threat. *Id.* at 1081.

As in *Mendez*, Defendants' mode of entry here foreseeably exacerbated the risk of misperceiving Sabbe's actions. As Braun explained, the V150 is a military-grade "piece of armor." The V150 not only has no public address system but it is hard to hear radio transmissions or conversation within the vehicle while inside it, or to see what

is happening in the surrounding area. Defendants' entry with the V150 thus reduced the officers' ability to perceive correctly Sabbe's movements, react appropriately to any perceived threat, and de-escalate confrontation. The officers' misperception of the threat posed by Sabbe, leading to Sabbe's fatal shooting, was a foreseeable consequence of their choice and method of entry.

So, whether or not the officers reasonably perceived that Sabbe pointed his gun or shot at them, I would hold that their perception was not a superseding cause. Where the officers' conduct "creates or increases the foreseeable risk of harm through the intervention of another force, and is a substantial factor in causing the harm, such intervention is not a superseding cause." Restatement (Second) of Torts § 442A (1965). Accordingly, "an event will be a superseding cause only if it is extraordinary in retrospect." *Mendez*, 897 F.3d at 1082.

Nothing about Sabbe's conduct was extraordinary under the circumstances. The Supreme Court has held that the Second Amendment "elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008). "[I]n light of the protections afforded by the Second Amendment, which are at their height where defense of one's home is at stake, it can be expected that some individuals will keep firearms . . . to defend themselves against intruders." *Mendez*, 897 F.3d at 1078.

By the time Defendants decided to enter the property, they were aware that Sabbe was probably an owner of the property, there to "protect" it after recent burglaries. As the Supreme Court has noted, "[b]urglary is dangerous because

it can end in confrontation leading to violence." *Sykes v. United States*, 564 U.S. 1, 9 (2011), *overruled on other grounds by Johnson v. United States*, 576 U.S. 591 (2015). The officers' knowledge that Sabbe was particularly on alert for intruders and, possibly, (legally) armed should have indicated that the likelihood of violent confrontation was high. The risk of a violent confrontation when an unmarked armored vehicle showed up on Sabbe's property unannounced—and without any prior communication between Sabbe and law enforcement—was eminently foreseeable.

Other factors support the conclusion that Sabbe's death was a foreseeable consequence of the unlawful entry. Significantly, the V150 was unmarked and, viewing the record most favorably to Sabbe, its emergency lights were not visible. Thus, Sabbe reasonably may not have understood that the V150 was a police vehicle, perceiving only a dangerous-looking military vehicle holding unidentified intruders. As the majority describes, "the V150 resembles a tank" and weighs several times more than a typical police cruiser. Majority Op. at 5, 8.

Even if Sabbe did understand the V150 was a law enforcement vehicle, he had no reason to understand the purpose of the officers' trespass. As discussed, *see supra* Part II.A.i.a, the record does not demonstrate there was probable cause that Sabbe had been or was committing a crime. And, again, during the nearly two hours that they observed his property before their entry, the officers never explained their presence, conveyed instructions, or issued warnings, and the tank had no capacity to do so.

Under these circumstances, it was surely foreseeable that the officers would use force, justifiably or otherwise, after

entering the property. "Especially where officers are armed and on alert, violent confrontations *are* foreseeable consequences of unlawful entries." *Mendez*, 897 F.3d at 1078 (emphasis in original). A fatal shooting was well within the scope of risk the Defendants' unconstitutional, military-style intrusion created.

I would hold that Defendants' unannounced, aggressive mode of entry onto Sabbe's property in an unmarked military vehicle, with no means of communicating with the property owner, was a proximate cause of Sabbe's death. In particular, I would hold that the officers' misperceptions of Sabbe's actions could not have been a superseding cause of his death.

## III.

As to the excessive force claim premised upon the PIT maneuvers by the V150, I concur in the majority's conclusion that a reasonable jury could find that the second PIT maneuver constituted excessive force in violation of the Fourth Amendment because "[e]ach of the [] *Graham* factors weighs in Plaintiff's favor." Majority Op. at 29.[17] As the majority recognizes, the "uncontested facts do not support a

---

[17] Neither the district court nor the majority opinion addresses whether there is sufficient evidence in the record for a reasonable jury to conclude that Sabbe's death was proximately caused by the PIT maneuver. The video footage shows that Sabbe attempted to leave his truck after the first attempted maneuver, and that the second maneuver appears to have caused the driver-side door to slam shut onto his leg. However, there is no evidence as to whether he sustained injuries from those collisions; rather, the evidence is consistent with the conclusion that Sabbe's cause of death was being shot.

Although the absence of proximate cause may limit the damages available for the excessive force claim tied to the PIT maneuver, it does not bar liability.

finding that, as of the time Defendants executed the PIT maneuvers, Sabbe had committed a serious crime or that he was fleeing or resisting arrest." Majority Op. at 29–30. And as the majority also holds, "we cannot say that the video shows that Sabbe initiated the first collision," Majority Op. at 28, so the record does not establish that Sabbe was an immediate danger to the officers in the V150 when they instigated the second PIT maneuver. Finally, the majority concludes, and I agree, that a reasonable jury could find that the existence of a less intrusive alternative—requesting equipment to attempt to communicate with Sabbe—and the officers' failure to warn Sabbe before using potentially deadly force weighed against them. Majority Op. at 30–32.

The majority holds, however, that Defendants are entitled to qualified immunity on the PIT maneuver excessive force claim, on the ground that there is no specific precedent "quantifying or characterizing the degree of force involved in using an armored vehicle to execute a PIT maneuver" or "that would have clearly established that the officers' use of the V150 under these circumstances was unconstitutional." Majority Op. at 33. I cannot agree.

We must, to be sure, be "mindful of the Supreme Court's repeated admonition not to define the right at issue at a high level of generality." *Orn v. City of Tacoma*, 949 F.3d 1167, 1178 (9th Cir. 2020). Thus, a plaintiff can most easily show that an officer's conduct was clearly established as unlawful by pointing to "[p]recedent involving similar facts." *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018). However, in "obvious case[s]," *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 8 (2021) (per curiam), officials "can still be on notice that their conduct violates established law even in novel factual circumstances," *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). A "general constitutional rule already identified in the

decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful." *Bonivert*, 883 F.3d at 872 (internal quotation marks, alterations, and citation omitted). Otherwise, law enforcement behavior that is unprecedented precisely because it is so obviously dangerous that no law enforcement entity has previously attempted it becomes insulated from liability, leaving citizens to bear their own losses from obviously high risk and unjustified uses of force.

The officers here stated that the force they administered by repeatedly ramming the V150 into Sabbe's vehicle was unprecedented. Braun testified at his deposition: "I don't know of anywhere in the nation where a piece of armor has been used to do a PIT maneuver, except for [here]. It's not conceivable, not something we ever thought of, not something we've ever addressed under policy." That Defendants' conduct was "not conceivable" is indicative of the perfectly obvious risks of deadly force presented by such a tactic.

Any reasonable officer would have understood that using an extremely large and heavy armored tank to immobilize a moving civilian vehicle by repeatedly striking it "creates a substantial risk of causing death or serious bodily injury." *Smith v. City of Hemet*, 394 F.3d 689, 693 (9th Cir. 2005) (en banc). Braun acknowledged that the use of the V150 in a PIT maneuver could be "highly probable to result in great bodily injury or death." As he explained, "a thousand different variables," including a vehicle's speed and size, can affect the amount of force involved in a PIT maneuver. *Cf. Scott v. Harris*, 550 U.S. 372, 375 n.1 (2007) (noting that the defendant officer decided not to execute a PIT maneuver because he was "concerned that the vehicles were moving

too quickly to safely execute the maneuver"). The weight and size of the V150—more than seven tons and more than seven feet tall—indubitably vastly increases the force transmitted by a PIT maneuver as compared with the force of a PIT maneuver executed with an ordinary police car. The video footage of the incident confirms that assessment, showing that "even at low speed, the impact [of the V150's collision with Sabbe's truck] bent the truck's bed inward, mangled the tailgate, and partially detached the rear bumper . . . [and] spun the truck 180 degrees." Majority Op. at 24. A reasonable officer would have understood that the use of the V150 to ram Sabbe's truck the second time constituted significant force far greater than the typical PIT maneuver, and was likely to cause death or serious physical injury.

Affirming the grant of qualified immunity in this case with regard to the second PIT maneuver does "not further the purpose of qualified immunity—to balance the competing need to hold public officials accountable . . . and the need to shield officials from harassment, distraction, and liability." *Bonivert*, 883 F.3d at 873. To the contrary, it exonerates officers for obviously unlawful conduct, so long as that particular conduct is *so* extreme and unprecedented that it is not contemplated by policy and has never been attempted before. I would reverse the grant of qualified immunity as to the Defendants' PIT maneuvers using the V150.

### IV.

Finally, I agree with the majority's holding that the district court properly dismissed plaintiff's *Monell* claim.[18] The majority reasons that even though the second PIT maneuver constituted unconstitutional excessive force on the facts of this case, the county's failure to train officers on the use of the V150 to execute PIT maneuvers did not rise to the level of deliberate indifference. I agree with the majority that Sergeant Braun's testimony that the department had never heard or thought of using an armored vehicle to carry out a PIT maneuver weighs against a finding that the county's failure to train its officers on such a use of the vehicle amounted to deliberate indifference.

### CONCLUSION

The majority's decision today shields the officers from liability for their extreme and disproportionate response to a situation that otherwise might have ended peacefully. The officers' use of an unmarked, military-grade vehicle to initiate a violent confrontation with an individual who was on his own property and posed no obvious risk to the officers or the public was unprecedented precisely because the response was so miscalibrated to the threat posed. The majority's application of qualified immunity in this case,

---

[18] The district court granted summary judgment on the *Monell* claim on the ground that no constitutional violation occurred. Alternatively, the district court concluded that the plaintiff has failed to identify a policy underlying the alleged constitutional violation, or to establish a genuine dispute of fact concerning whether the failure to train the officers amounted to deliberate indifference. Because I would conclude that a jury could find that three constitutional violations occurred, I would affirm the district court's dismissal of the *Monell* claim on the second ground, not the first.

rather than facilitating the ability of law enforcement officers to protect the public, condones decision-making that escalates risk and results in a tragic, unnecessary death.

For the foregoing reasons, I concur in Part II.A and Part IV of the majority's opinion, and in Part III insofar as it holds that the Defendants are not entitled to summary judgment as to whether Sabbe shot at the officers in the armored vehicle before they shot at him. I respectfully dissent from the remainder of the majority opinion.